THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN HENRY WITHERS, Defendant-Appellant.

First District (2nd Division)   No. 81—2795

Opinion filed June 21, 1983.

Steven Clark, of State Appellate Defender's Office, of Chicago (David S. Fleming, of Karon, Morrison, & Savikas, Ltd., of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Paula Carstensen, and Peter M. DeLongis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant was found guilty by a jury of one count of armed robbery, unlawful restraint, and armed violence, but not guilty of attempted murder. Because the armed violence count was predicated upon the unlawful restraint, the circuit court entered judgment only on the armed robbery and armed violence counts. The court subsequently found defendant to be an habitual criminal and sentenced him to life imprisonment.

On appeal, defendant raises as issues whether: (1) the State's use of peremptory challenges to exclude all blacks from the jury violated his right to a fair trial; (2) defense counsel's mention of an alibi defense in her opening statement, never referred to again during trial or in closing argument, deprived him of effective assistance of counsel; (3) defendant's armed violence conviction was based upon acts separate and distinct from those upon which his armed robbery conviction rested; and (4) the habitual criminal act (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1 et seq.) is unconstitutional because it: (a) requires the court to sentence an offender to life imprisonment if it finds him to be an habitual criminal and allows the court no discretion in this matter, or (b) permits the State to determine whether or not a life sentence will be imposed without setting out any standards which it must follow in making this determination.

The pertinent evidence adduced at trial reveals the following: Eddie Davis testified that he was store manager of a fried chicken restaurant on South Pulaski Avenue in Chicago during the early morning hours of October 19, 1980. At about 2 a.m. while he was working the front register and Dwayne Lacey, the side, drive-thru register to his

right, defendant's accomplice, later identified as Gerald King, pointed a gun at Davis and told him, "This is a stickup." As King moved to Lacey's register, defendant stepped in front of Davis' register and had him call his assistant manager, Vickie Cox, to the front. Defendant then jumped over the counter. He was just under six feet but much heavier than King, whom Davis had described as slim. He had a heavy beard, and was wearing a light-colored waist-length beige jacket and a cowboy hat of the same color.

Once over the counter, defendant "directed" Davis back to an office in the rear of the store where the safe was located. Davis could not remember the combination to the safe so he called Cox and asked her to open the safe, which she did. At about this time, King informed defendant that the police were outside. Defendant returned to the front of the store and watched King back out of the front door with the 10 or 15 customers who were in the store at the time. He then picked up the gun King had left on the counter, looked around the store, noticed a door in the back, asked Davis to open it for him and ran out the door. The robbery lasted approximately five minutes. The store was brightly lighted. About one week after the robbery, Davis identified defendant in a six-man lineup.

Dwayne Lacey testified that he was at the drive-thru cash register on the date and at the time of the crimes. King walked up to his register, pulled out a gun, and told him to put the money into a bag and give it to him, which Lacey did. King put the bag into his pocket. Defendant then asked Davis for the keys to the "bleed" boxes beneath the registers where excess cash was placed. When Davis gave him the keys, defendant jumped over the counter, threw the keys to Lacey and told him to open the boxes. Because Lacey was having difficulty, Davis stopped and opened one for him as he was walking past him towards the office. Defendant followed Davis into the office. Davis then called Cox back to the office. While they were there, Lacey took money out of the box and put it into another bag.

Later, police cars began pulling up in front of the store. King called out to defendant who returned to the front of the store. He told King to slide his gun across the counter to him, put his hands up and back out of the store as if he were a customer, which King did. Defendant slipped the gun into his pants, noticed a door towards the back of the store, asked Davis to open it and went out. Defendant was wearing a beige jacket and a beige cowboy hat. Lacey described King and defendant to the police. Four or five days later an investigator showed him a group of pictures and Lacey identified defendant from among them. A few days later he picked King and defendant out

of the same lineup Davis had viewed.

Vickie Cox testified that she was on break shortly after 2 a.m. on October 19, 1980, when Davis called her to the front of the store. Defendant was standing on the other side of the counter near the front register pointing a gun at him. He was black and wearing a beige-colored cowboy hat. She saw Lacey take money from his register, put it in a bag and give it to King, who was standing near his register. At defendant's prompting, Davis walked back to the office, followed by defendant. A few moments later Davis called her to open the safe. Defendant and Davis stood outside the office as she opened it because the room was very small. Defendant left. She did not see him or King again that evening because she stayed in the office until the police arrived. At that time she determined that $50 had been taken from the drive-thru window register. She also found a bag in the customer area of the store containing approximately $300 in $10 and $20 denominations. Four days later, she identified defendant from a photographic display.

Chicago Police Officer Edward Carfora testified that he and his partner, Wayne Klacza, were on duty and in uniform on October 19, 1980, at about 2 a.m. when they learned from a passing motorist that there was a robbery in progress across the street. Carfora pulled into the parking area on the south side of the store and began questioning people there as his partner went to the entrance of the store and did the same. Carfora noticed a man climbing a fence separating the area from the adjacent alley. The man paused a moment at the top of the eight feet to 10 feet high cyclone fence about three car lengths away from where Carfora was standing. The parking lot was brightly lighted. The man was black, had a beard and a mustache, and was wearing dark blue jeans and a light tan or beige-colored fingertip jacket. The man on the fence was defendant.

Defendant jumped into the alley and then ran toward an empty lot southwest of the store towards Monroe. Carfora doubled back around the fence, called out to his partner and ran after defendant, who by this time was a couple of hundred feet ahead of him. Defendant ran west on Monroe. Carfora followed him. As defendant approached Karlov, Carfora heard a shot coming from that direction. A second later he saw defendant turn and fire a second shot, at him. Carfora saw the flash from the muzzle of the gun and returned the fire, shooting at defendant six times in rapid succession. He saw defendant turn north on Karlov, but paused to reload his revolver. He did not see defendant again that evening, although he and other policemen searched the hallways, gangways, and basements of the build-

ings in the vicinity in an attempt to find him. Carfora returned to the store about half an hour later and found a tan-colored cowboy hat in the southwestern corner of the property where he had seen defendant climbing the fence.

On cross-examination, Carfora stated that defendant had paused at the top of the fence for a couple of seconds; that he had lost sight of him momentarily after he had jumped over the fence; and again when the witness turned west onto Monroe and then north onto Karlov. Defense counsel showed Carfora a report in which he had described the lighting as poor. On redirect, Carfora explained that the report to which defense counsel had referred was a special report all policemen are required to file whenever they fire their revolvers under circumstances which might endanger the life of another and described the lighting conditions on Monroe near Karlov where he had shot at defendant, and not the lighting conditions in the parking area outside the store where he had first seen him. Carfora later identified defendant at the lineup previously mentioned.

Officer Klacza testified that when he and Carfora pulled up in front of the fast-food store, he went directly to the entrance of the premises where several people were standing. Ten or fifteen people were inside the restaurant at the time. As he approached the entrance to the store, two of them came out. He stopped them, pushed them against the plate glass window to the right of the entrance, and as he began to interrogate them, saw a man wearing a beige jacket and a cowboy hat on the employee side of the counter. The man was black, 5 feet 10 inches or 11 inches tall, heavyset, and had a beard. The man was defendant. He was defendant go to the back of the store but continued to search the two men in front of him until another man came running out of the store and told him that the man in the cowboy hat was going out the back door and was armed. Klacza ran around the north side of the building towards the rear of the store. He heard Carfora call out that someone was going over the fence, he turned back and ran around the front of the store. Klacza ran around the fence after Carfora. As he was running through the lot, he heard two shots, and then another six fired in rapid succession. He caught up with Carfora at the corner of Karlov and Monroe. After unsuccessfully searching for defendant, they returned to the store where they found the cowboy hat defendant was wearing in a garbage bin behind the store. The store was well lighted. About a week later, he picked King and defendant out of the six-man lineup previously described.

Lawrence W. Soltysiak, a detective with the Area Four Violent

Crimes Unit, spoke with Carfora, Klacza, Davis, Lacey, Cox and Christine Watts that morning. Watts was working in the kitchen at the time of the robbery, but was never called to testify. Later, he went back to the store and showed Lacey and Cox seven photographs. Each identified defendant as one of the two men who had robbed the store. On October 24, 1980, he spoke with a nurse at Evanston Hospital, who identified defendant as a man whom they had treated on the morning of October 19, 1980. Soltysiak arrested defendant three days later and conducted the lineup, referred to earlier, later that day.

The nurse, Mary Harrigan, corroborated Soltysiak's testimony.

The parties then stipulated that, if called, a Dr. Bloom of Evanston Hospital would testify that he treated defendant for a gunshot wound to the upper right back on October 19, 1980, but did not remove the bullet lodged there because it was medically better not to. The parties also stipulated that defendant was 25 years old at the time of the robbery.

After their respective exhibits were admitted, both sides rested, the defense without calling any witnesses. At that time the circuit court granted defendant's motion for a directed verdict with respect to the armed robbery count relating to Davis but denied it as to all other counts. The jury subsequently found defendant not guilty of attempted murder of Officer Carfora, but guilty of armed robbery of Lacey, unlawful restraint of Davis, and armed violence predicated upon the latter offense. The circuit court then entered judgment of conviction on the armed robbery and armed violence counts only, finding that the unlawful restraint verdict merged into the latter. The court later found defendant to be an habitual criminal and sentenced him to life imprisonment.

## I

■ Defendant first argues that by excluding all blacks from the jury, the State deprived him of his right to an impartial jury to which he is entitled under the sixth amendment to the United States Constitution and article I, section 8 of the Illinois Constitution. He contends that both provisions require the jury to be drawn from a representative cross section of the community. The State exercised seven of nine peremptory challenges to exclude blacks who might otherwise have been impaneled. As a result, defendant was tried by an all-white jury. Defendant contends that the State excluded these prospective black jurors simply because they were black.

The record reveals that the jurors were diverse but alike in many ways. Most were homeowners and middle-aged. Many had one or

more children still in school. Some were young and unmarried. Some were members of civic or church-related organizations or associations, but most were not. Most read the same kinds of magazines—Time, Reader's Digest, Sports Illustrated, National Geographic. Two were members of the National Rifle Association. For these reasons defendant contends that the circuit court erred when it refused to require the State to show that it had not excluded all the prospective black jurors simply because they were black, citing *People v. Payne* (1982), 106 Ill. App. 3d 1034, 436 N.E.2d 1046, *People v. Gosberry* (1982), 109 Ill. App. 3d 674, 440 N.E.2d 954, and *People v. Gilliard* (1983), 112 Ill. App. 3d 799, 445 N.E.2d 1293.

The supreme court recently (May 27, 1983) considered the same issue, under substantially similar facts, in *People v. Williams* (1983), 97 Ill. 2d 252. The *Williams* opinion discusses each of the authorities cited by defendant and holds:

"In *People v. Davis* (1983), 95 Ill. 2d 1, we rejected a contention by the defendant that the State's exercise of peremptory challenges which resulted in an all-white jury deprived the defendant of a fair and impartial jury. We noted that the contention was contrary to *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, in which the Supreme Court held that an exercise of peremptory challenges which resulted in the selection of a jury composed of white jurors did not of itself show a constitutional violation. Under *Swain*, a constitutional issue of equal protection could not arise unless there was a systematic and purposeful exclusion of blacks because of race from juries in case after case. 380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 837.

\* \* \*

The defendant here cites another decision, in which the exclusion of blacks through the use of peremptory challenges was held to be a violation of Federal constitutional law. That case, *People v. Payne* (1982), 106 Ill. App. 3d 1034, was decided by the third division of the First District of the appellate court. It was held that the use of peremptory challenges by the State to exclude blacks from a jury during *voir dire* because they are black is a violation of the defendant's right to a jury drawn from a fair cross section of the community. The *Payne* court relied upon *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, in which the Supreme Court held that it is fundamental to the sixth amendment guarantee of an impartial jury that 'the defendant in a criminal trial [have] the oppor-

tunity to have the jury drawn from venires representative of the community.' (419 U.S. 522, 537, 42 L. Ed. 2d 690, 702, 95 S. Ct. 692, 701.) ***

The court in *Payne* believed that the use of peremptory challenges in particular cases to exclude members of any discrete group because of their group affiliations also was invalid, because otherwise 'the constitutional right to a jury drawn from a fair cross section of the community could be rendered a nullity through the use of peremptory challenges.' (*People v. Payne* (1982), 106 Ill. App. 3d 1034, 1037.) The *Payne* court said that *Swain* was not controlling in the circumstances because in *Swain* the defendant's challenge was based upon the equal protection clause in the fourteenth amendment, not upon the sixth amendment. ***

The division of the appellate court that decided *Payne* has followed its decision in subsequent cases. (*People v. Gilliard* (1983), 112 Ill. App. 3d 799; *People v. Gosberry* (1982), 109 Ill. App. 3d 674.) *Payne* has been considered and rejected, however, by two other divisions of that court. *People v. Newsome* (1st Dist., 2d Div. 1982), 110 Ill. App. 3d 1043; *People v. Teague* (1st Dist., 1st Div. 1982), 108 Ill. App. 3d 891.

*Payne* does not satisfactorily meet the questions which must be addressed in considering the problem." (97 Ill. 2d 252, 274-76.)

The *Williams* opinion went on to discuss the *Swain* and *Taylor* cases, as follows:

"We consider that the authority of *Swain* was not lessened because of the recognition of a sixth amendment fair-cross-section requirement in *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692. The court in *Taylor* held that it is fundamental to the sixth amendment right to a jury trial that the selection of a petit jury be from a representative cross section of the community. ***

There was no retreat in the *Taylor* opinion from the view that it is an essential part of our system of trial by an impartial jury that both sides be allowed in particular cases to exercise peremptory challenges on any ground they select. It appears that the complaint addressed in *Taylor* is the systematic exclusion of a group from the jury system, not from any particular jury." (97 Ill. 2d 252, 278.)

The supreme court in *Williams* thus rejected the same constitutional argument defendant raises in the case before us. It declined to ap-

prove *Payne* or *Gilliard* and summarily reversed *Gosberry*. (*People v. Gosberry* (1983), 93 Ill. 2d 544.) To the same effect are also *People v. Osborn* (1983), 111 Ill. App. 3d 1078, 444 N.E.2d 1158; *People v. Baylor* (1982), 111 Ill. App. 3d 286, 443 N.E.2d 1137; *People v. Jones* (1983), 114 Ill. App. 3d 576; *People v. McCray* (1982), 57 N.Y.2d 542, 443 N.E.2d 915, *cert. denied* (1983), ___ U.S. ___, 77 L. Ed. 2d 1322, 103 S. Ct. 2438.) Accordingly, defendant's argument must be rejected. *People v. Jones* (1983), 114 Ill. App. 3d 576, 585.

## II

■■ Defendant next argues that he was deprived of his right to a fair trial because his trial counsel informed the jury in her opening remarks that the defense would establish an alibi, but during trial never offered any evidence tending to establish this defense and never explained to the jury why she had not. Such conduct, he insists, constituted actual incompetence which deprived him of a fair trial. In addition, he contends that by promising to present an alibi defense counsel may have given the jury the impression that he was not only required to rebut the State's evidence but also to present evidence of his own. For this reason defendant believes that the jury may have decided the case on the weaknesses of his case rather than upon the strength of the State's case, which would have constituted plain error. (*People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96; *People v. Poltrock* (1974), 18 Ill. App. 3d 847, 310 N.E.2d 770; and *People v. Carroll* (1970), 119 Ill. App. 2d 314, 256 N.E.2d 153.) These cases are factually distinguishable, however, since in each the reviewing courts found the evidence offered by the State to be so improbable and unsatisfactory that they could not in good conscience affirm defendant's conviction. In the instant case, the evidence of defendant's guilt is overwhelming. See *People v. Lewis* (1981), 97 Ill. App. 3d 982, 423 N.E.2d 1157; *People v. Tilden* (1979), 70 Ill. App. 3d 859, 388 N.E.2d 1046.

Further, defense counsel here thoroughly and vigorously cross-examined and re-cross-examined the State's witnesses in an attempt to weaken the impact of their testimony; raised numerous objections; successfully, in part, moved for a directed verdict; presented a thorough and well-organized closing argument; moved for a new trial; and made extensive arguments in mitigation. Her failure to present alibi evidence is unexplained; however, the decision to call or not to call witnesses to testify on defendant's behalf is a matter of trial strategy. (*People v. Tate* (1981), 94 Ill. App. 3d 192, 418 N.E.2d 1048.) Further, the court instructed the jury that neither opening statements nor closing statements are evidence and that statements made by counsel not

based upon the evidence must be disregarded. (Illinois Pattern Jury Instruction, Criminal, No. 1.03 (2d ed. 1981).) In considering counsel's competency, the totality of her conduct at trial must be considered, not merely particular errors alleged. (*People v. Murphy* (1978), 72 Ill. 2d 421, 435-38, 381 N.E.2d 677.) The overall performance of defense counsel here was not of such a caliber so as to produce substantial prejudice without which the result of the trial would have been different. *People v. Greer* (1980), 79 Ill. 2d 103, 121, 402 N.E.2d 203; *People v. Royse* (1982), 107 Ill. App. 3d 326, 330-34, 437 N.E.2d 679; *People v. Pendleton* (1982), 104 Ill. App. 3d 1104, 1109, 433 N.E.2d 1076; *People v. Corder* (1982), 103 Ill. App. 3d 434, 437, 431 N.E.2d 701.

## III

■■ Defendant maintains that because the separate acts upon which armed robbery and armed violence convictions were predicated occurred within moments of each other in the course and in furtherance of the alleged armed robbery, his armed violence conviction should be vacated. In *People v. Myers* (1981), 85 Ill. 2d 281, 288, 426 N.E.2d 535, the supreme court affirmed convictions for armed robbery, aggravated kidnaping and armed violence where defendant had held a machete to the victim's throat and cut into it several times, the last time severing the victim's windpipe, stating: "As long as there are multiple acts as defined in [*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838], their interrelationship does not preclude multiple convictions and the imposition of concurrent sentences based upon them." (See *People v. Prude* (1980), 86 Ill. App. 3d 1039, 408 N.E.2d 506.) In light of the foregoing authorities, the concurrent sentences defendant received for armed robbery predicated upon the taking of money from Lacey, and armed violence predicated upon the unlawful restraint of Davis, were properly imposed since, albeit incidental and closely related, yet they were separate and distinct offenses.

## IV

■■ Defendant challenges the constitutionality of the act relating to habitual criminals (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1 *et seq.*) (act) under which he was sentenced. In 1975, defendant had been convicted of the felonies of armed robbery, rape and deviate sexual assault. He was convicted in 1979 for the felonies of attempted murder and attempted armed robbery. Each 1975 and 1979 offense contained the same elements as those now designated as Class X felonies, thereby fulfilling the initial requirements of the act. (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1(a).) The current offenses were committed on

October 19, 1980, more than four months after the effective date of the act; they were committed within 20 years of the judgment entered on the first felony convictions in 1975; they were committed after the second felony convictions in 1979; and the second offense was committed after conviction on the first offense. This conviction history satisfies additional prerequisite statutory standards for application of the act. Ill. Rev. Stat. 1981, ch. 38, pars. 33B—1(d)(1), (2), (3), (4). ·

One of defendant's claims of unconstitutionality is that the statute mandatorily requires the circuit court to sentence a defendant found to be an habitual criminal to natural life imprisonment (Ill. Rev. Stat. 1981, ch. 38, pars. 33B—1(e), 1005—5—3(c)(5)), thereby precluding judicial opportunity to tailor the sentence to be imposed to fit the particular circumstances of each case. Such action, according to defendant, constitutes undue infringement on judicial power and violates article II, section 1 of the 1970 Illinois Constitution, which provides, in part, that "No branch shall exercise powers properly belonging to another." Defendant misconceives the respective roles of the legislature and the judiciary in this regard. It is the legislature's prerogative to determine what conduct shall constitute a crime and what penalty shall be imposed for its commission, unless the challenged penalty is clearly in excess of constitutional limitations. (*People ex rel. Carey v. Bentivenga* (1981), 83 Ill. 2d 537, 542, 416 N.E.2d 259; *People v. Gonzales* (1962), 25 Ill. 2d 235, 240, 184 N.E.2d 833; *People v. Landers* (1927), 329 Ill. 453, 457, 160 N.E. 836.) We find no such excesses in the act.

Defendant also contends that the act is unconstitutional because it gives the prosecutor unbridled discretion in deciding whether or not to seek the imposition of a life sentence in any given case. He points to section 33B—2(a) of the act which provides, in part, that the prosecutor "may" file a verified written statement setting forth a former conviction of a section 33B—1 offense. Assuming, *arguendo*, that the act may be so construed, an analogous procedure was considered by the supreme court in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 397 N.E.2d 809. There, the constitutionality of section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)) was upheld, which provides that the State must first request the death sentence before it can be imposed. The argument in *Cousins*, that prosecutorial discretion violated due process and the separation of powers doctrine, was rejected by the court, which observed that the State's Attorney has always enjoyed wide discretion, including the decision of whether to initiate any prosecution at all, to choose which of several charges shall be brought, and to manage the criminal litiga-

tion, citing *People v. Rhodes* (1967), 38 Ill. 2d 389, 396, 231 N.E.2d 400, *People v. McCollough* (1974), 57 Ill. 2d 440, 313 N.E.2d 462, *appeal dismissed* (1974), 419 U.S. 1043, 42 L. Ed. 2d 637, 95 S. Ct. 614, *People v. Brooks* (1976), 65 Ill. 2d 343, 349, 357 N.E.2d 1169, and *People v. Golz* (1977), 53 Ill. App. 3d 654, 658, 368 N.E.2d 1069, *cert. denied* (1978), 437 U.S. 905, 57 L. Ed. 2d 1134, 98 S. Ct. 3091, among other authorities.

Section 33B—1(a) provides, in part, as follows:

> "(a) *Every person* who has been twice convicted in any state or federal court of an offense that contains the same elements as an offense now classified in Illinois as a Class X felony or murder, and is thereafter convicted of a Class X felony or murder, committed after the 2 prior convictions, shall be adjudged an habitual criminal." (Emphasis supplied.) (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1(a).)

The foregoing language of the statute does not explicitly delegate to the State the power to choose which defendants shall be made subject to its terms. Rather, its provisions apply to "every person" who meets its criteria. The word "may" in section 33B—2(a) can be read as prescribing how the prosecutor brings to the court's attention a defendant's prior conviction history.

■ Defendant's final contention with respect to the constitutionality of the habitual criminal act is that the imposition of a mandatory natural life sentence without the possibility of early release, parole or consideration of mitigating circumstances violates the eighth and fourteenth amendments of the United States Constitution. Under section 3—3—3(d) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1003—3—3(d)), those persons sentenced to a term of natural life imprisonment may not be paroled or released except through executive clemency. An exhaustive review of recidivist and habitual criminal statutes enacted throughout the nation was undertaken by the United States Supreme Court in *Rummel v. Estelle* (1980), 445 U.S. 263, 63 L. Ed. 2d 382, 100 S. Ct. 1133 (*Rummel*). There, in a five to four decision, the Supreme Court overruled similar constitutional challenges to a Texas recidivist statute which prescribed life imprisonment upon conviction of three felonies. The majority observed that the statute mandated such a sentence only after shorter terms of imprisonment proved ineffective (445 U.S. 263, 278 n.17, 63 L. Ed. 2d 382, 394 n.17, 100 S. Ct. 1133, 1141 n.17), and that the purposes of such recidivist statutes are to "deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from

the rest of society for an extended period of time." (445 U.S. 263, 284, 63 L. Ed. 2d 382, 397, 100 S. Ct. 1133, 1144-45.) The crimes at issue in *Rummel* were relatively innocuous financial offenses; those involved in the present case were violent crimes against persons, categorized as Class X felonies.

Although a distinguishing factor in *Rummel* is that, under the Texas statute, parole was described as a "slim" possibility, but not a "right," available to a convicted felon (445 U.S. 263, 280-81, 63 L. Ed. 2d 382, 395, 100 S. Ct. 1133, 1142), the dissent noted that parole is simply an act of executive clemency which the Governor of Texas exercised very sparingly in recommendations made to him for release (445 U.S. 263, 294, 63 L. Ed. 2d 382, 403, 100 S. Ct. 1133, 1149). Section 3—3—3(d) of the Illinois Unified Code of Corrections specifically makes clear that executive clemency may be invoked in behalf of one serving a term of natural life imprisonment. In this connection observations by the United States Supreme Court in *Schick v. Reed* (1974), 419 U.S. 256, 42 L. Ed. 2d 430, 95 S. Ct. 379, should be considered. In that case, the President of the United States had commuted the sentence of death of a soldier for murder to a term of natural life imprisonment without parole or suspension of sentence. The Supreme Court referred to certain statutes and observed that "The no-parole condition attached to the commutation of [a] death sentence is similar to sanctions imposed by legislatures such as mandatory minimum sentences or statutes otherwise precluding parole; it does not offend the constitution." (419 U.S. 256, 267, 42 L. Ed. 2d 430, 439, 95 S. Ct. 379, 385.) Among the statutes to which it referred was section 848 of the Federal controlled substances act (21 U.S.C. sec. 848 (1970)). Under section 848(a)(1) any person who engages in a continuing criminal enterprise shall be sentenced to terms of imprisonment which may include life imprisonment. Under section 848(c) of the act, imposition or execution of such sentences shall not be suspended and probation shall not be granted. Another such statute to which the Supreme Court referred was adopted by Massachusetts (Mass. Gen. Laws Ann., ch. 265, sec. 2 (West 1970)), which provides for life sentence without parole for first degree murder unless commuted by the governor and council. Such sentences have the same effect as the imposition of a natural life sentence as provided for in the Illinois habitual criminal act. A similar provision was referred to by the majority in *Rummel* without suggestion of constitutional infirmity, namely, the Mississippi recidivist statute (Miss. Code Ann. sec. 99—19—83 (Supp. 1979)), which provides for a life sentence without parole upon conviction of three felonies including at least one violent felony (445 U.S.

263, 281, 63 L. Ed. 2d 382, 395, 100 S. Ct. 1133, 1143). It may be inferred from the foregoing that the United States Supreme Court has recognized as constitutionally permissible sentences of life imprisonment without the possibility of parole, as in the instant case.

In a case recently decided, *People v. Taylor* (1983), 115 Ill. App. 3d 621, defendants were found guilty of the murders of two persons. The appellate court there held that section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c)), imposing mandatory natural life imprisonment, must be construed as discretionary rather than mandatory in order to avoid violation of article I, section 11 of the 1970 Illinois Constitution. In that case, however, because defendants murdered more than one victim in related circumstances, the statute's mandatory provisions applied and the statute could have been construed so as to have required imposition of natural life sentences without a court ever having considered rehabilitative or mitigating factors. The statute involved at bar, section 33B—1, is significantly different, however. The mandatory aspect of section 33B—1 is not triggered unless and until three Class X felonies have been committed within 20 years of the date of the first conviction, among other requirements. As will be seen presently, two previous adjudications afforded defendant opportunities to present mitigating evidence and sentencing alternatives at which the circuit court could have exercised discretion in determining appropriate penal dispositions.

The foregoing approach was taken in *People ex rel. Carey v. Chrastka* (1980), 83 Ill. 2d 67, 413 N.E.2d 1269, in which the supreme court upheld the constitutionality of section 5—12 of the Juvenile Court Act, involving habitual juvenile offenders (Ill. Rev. Stat. 1981, ch. 37, par. 705—12). That act provides that a juvenile who is three times adjudicated a delinquent for having committed an offense that would be a felony if committed by an adult, shall be confined until he reaches the age of 21. In rejecting the argument that the mandatory confinement to age 21 violated the rehabilitative objective of article I, section 11 of the 1970 Illinois Constitution, the supreme court stated that the legislature could legitimately find that one who has committed three serious offenses has benefitted little from the rehabilitative measures of the juvenile court system and exhibited little prospect for restoration to meaningful citizenship. The court found that because there was prior consideration of mitigating or rehabilitative factors in the two previous predicate adjudications, the "rehabilitative purposes of the system are not completely foresaken, but after the commission by an individual of a third serious offense, the interest of society in

being protected from criminal conduct is given additional consideration." 83 Ill. 2d 67, 80.

In the case *sub judice,* defendant's previous predicate felony convictions in 1975 and 1979 involved consideration of his rehabilitation prospects through sentencing hearings at which the courts were required to consider, *inter alia,* presentence reports, evidence and information offered by the parties in aggravation and mitigation, and arguments as to sentencing alternatives. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—4—1(a); Ill. Rev. Stat. 1977, ch. 38, par. 1005—4—1(a).) Imposition of a natural life sentence in the present case was mandated by the act only after commission in 1980 of his third series of Class X felonies. The requisite attention to rehabilitative measures required by article I, section 11, therefore has been fulfilled.

Accordingly, the challenges raised by defendant to the constitutionality of the act relating to habitual criminals cannot be sustained.

From the foregoing discussion, no bases for disturbing defendant's convictions or sentences emerge; they must, therefore, be affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.