THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOE COLEMAN, Defendant-Appellant.

Fifth District   No. 5—82—0329

Opinion filed November 8, 1984.

Randy E. Blue and Daniel M. Kirwan, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John R. Clemons, State's Attorney, of Murphysboro (Kenneth R. Boyle, Stephen E. Norris, and Raymond F. Buckley, Jr., all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

Following a jury trial, the defendant, Joe Coleman, was convicted of armed robbery and sentenced under the statute relating to habitual criminals (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1) to life imprisonment without parole. On appeal, the defendant contends (1) that he was not proved guilty beyond a reasonable doubt because of the insufficiency of evidence linking him to the crime charged and the lack of evidence of use of a deadly weapon, (2) that the trial court erred in allowing the prosecution to impeach defense witness Sandra Coleman with her prior inconsistent statement, and (3) that the statute mandating life imprisonment for habitual criminals violates due process and is unconstitutional under article I, section 11, of the Illinois Constitution. We affirm.

The defendant was charged with the armed robbery of James Clough, an attendant at Lyerla's Texaco Station in Murphysboro, which occurred on November 24, 1981. At trial, Clough testified that on the evening in question he closed the Texaco station at about 7 p.m. and went to his car. He was carrying a bank bag containing $640. He opened the car door, threw the bank bag on the seat and started to enter the car. He heard a noise at the front of the automobile and got out of the car, at which time he saw a black man standing on the other side of the open car door. The man was facing Clough, with the car door between them, and was a foot and a half to three feet away.

Clough testified that the man "had something orange in his hands," which Clough thought was "either a can of mace or a pistol or some type of weapon." The man pointed this object at Clough's face and said, "Hey man, be cool. Stay here." At that time Clough turned and ran to some gasoline pumps about 50 to 100 feet from the car. Clough stated that he did this because he "figured that [the robber] had a weapon and that he would shoot me or spray me, cause some type of harm to me." When Clough reached the pumps, he glanced back and saw the man bending over in Clough's car. When he returned to his car later with a police officer, the money bag was missing.

Clough stated that during this confrontation he was able to view the robber's face for at least 10 seconds. There was light in the alley where the incident occurred from a streetlight across the street on

the corner and from the lights of the Dairy Queen across the street from the station. In addition, a little light came from the windows of a trailer located on the edge of the parking lot and from a couple of lights that were left on in the station itself.

Later that night, Clough gave a statement to the police in which he described the man who had confronted him at the station as being about 22 years of age and a little taller than 5' 7". Clough further stated that the robber had "a little bit of a beard" and was wearing a red or orange sock-hat and bluish-gray mechanic's overalls. Clough also told the police that the man had something orange in his hands that "could have been a can of mace or a pistol."

On November 27, three days after the incident, Clough selected the defendant's picture from an array of five photographs shown him by the police. At that time, he commented that "it looked like the person [who had robbed him] but [that he] wasn't absolutely sure." Clough explained at trial that the reason for his hesitancy was that he "was still scared that the person would come after [him], that he would still try to kill [him] or seek revenge in some way." Later that same evening, Clough called the officer who had shown him the photographs and, after viewing the photographs again, positively identified the defendant's photo as that of the man who had robbed him. At trial, Clough again identified the defendant as the perpetrator of the robbery.

Another witness for the State, Trace Brown, testified that at about 6:40 p.m. on November 24, he saw two "average" size black men run to a 1979, 1980, or 1981 "rusty red" AMC Spirit automobile that was parked in the vicinity of the robbery in Murphysboro. The car's license plate number was tentatively noted by Brown as UB 1995. The two men entered the vehicle and drove off rapidly without turning on the car's headlights. Brown could not identify the two men but stated that he could tell by the way they were running that they were not old. At least one of the men was carrying a paper bag, and one of them had a "stocking" hat on.

Later that evening, Brown reported what he had seen to the police because he thought it "looked funny." While driving around with a Carbondale police officer at about 10 that night, he again saw this AMC Spirit automobile parked on Washington Street in the northeast part of Carbondale. At trial, Brown identified photographs of the defendant's AMC Spirit automobile as the car he had seen in Murphysboro on the evening of the robbery.

Carbondale police detective Don Strom testified that at 7 p.m. on November 24 he received a radio dispatch relating that an armed rob-

bery had just occurred in Murphysboro. The suspects' getaway car was described as a dark-colored AMC Spirit, possibly bearing Illinois registration of UB 1995. Strom proceeded to the 200 block of North Washington Street in Carbondale, an area known as the "Square," in search of the described vehicle. He remained in that vicinity until about 8:10 p.m. without seeing the car. Strom then left the area and returned at 8:22 p.m., at which time he saw a car matching the description he had been given sitting at 211½ North Washington Street.

Strom parked his car nearby and kept the AMC Spirit under observation. About 11:15 p.m., a black male entered the car and drove away. After stopping the car, Detective Strom arrested the driver, whom he identified as the defendant. After a search, three 12-gauge shotgun shells were found and removed from the defendant's jacket pocket.

En route to the Carbondale police station, the defendant stated that he had been in the Palms Lounge on the Square since about 6 that evening. Upon further questioning at the police station, the defendant stated that he had given his car keys to a friend during the course of the evening but that the keys had been returned to him at most 12 minutes later. He also stated that when he went to his car at 11:15 that night, it was parked in the same spot where he had parked it earlier.

The defendant's car was towed to the police department and searched with his consent. On the floor in front of the passenger seat, the police found an orange and white towel with a 12-gauge sawed-off shotgun in it. A loaded revolver was found inside the pouch of the door on the driver's side of the defendant's automobile.

Strom testified further that the defendant was 42 years of age and 5' 10" tall. At the time of his arrest, the defendant had a beard and was wearing a blue shirt and blue pants, a tan leather jacket and a cowboy hat. Strom stated that the defendant told him he was carrying the three shotgun shells in his pocket "in case his brother-in-law asked him to go rabbit hunting."

Sandra Coleman, the defendant's wife, was the last prosecution witness. She testified that on the evening of November 24 her husband left home about 6 or 6:15 p.m. and did not return home again that night. The prosecutor at this point claimed surprise and asked to have Sandra Coleman declared a hostile witness. The court so ruled, and the State questioned the witness regarding a statement she had made to the police that the defendant had returned home at 7:40 p.m. on the night of the robbery and then had left again at 8 or 8:30 p.m. to return to the Square. Sandra Coleman acknowledged having made

this statement but disavowed its truth, saying that at the time she made the statement, it had been less than 24 hours after her husband's arrest and she "was upset" and "had no idea of really what was going on."

The defendant presented a number of alibi witnesses who testified to the effect that the defendant had been in the Palms Lounge in Carbondale at the time the robbery occurred. Florence Blythe, a patron of the bar, stated that she saw the defendant in the Palms at 6:30 p.m. and did not see him leave before she left around 10 p.m. About 7 p.m., she saw the defendant hand some keys to a black man she did not know. William Cook stated that he saw the defendant's car leaving the Square when he (Cook) arrived in the area shortly before 7 p.m. He did not see who was in the vehicle, but he went into the Palms, where he talked with the defendant between 6:55 and 7:15 p.m. Cook admitted on cross-examination that he had been fined for theft a few years previously. David Cavitt, a friend of the defendant's, recounted that he was in the Palms between 3:30 and 11 p.m. on the date in question. He saw the defendant in the lounge around 6 p.m. and did not see him leave during the evening. Cavitt had previously served a sentence for armed robbery.

Edna Bradsfield, a barmaid at the Palms, testified that she saw the defendant when she arrived at work about 6 p.m. on November 24 and did not see him leave before about 10 or 11 p.m. She stated that she probably would have noticed if the defendant had gone from the bar for an hour. Bradsfield stated that the defendant "ran a tab" for his drinks that night, which was approved by the lounge owner and signed by the defendant about 7 p.m. The owner, Russell Branch, testified that he saw the defendant in the Palms around 6 p.m. and approved his request to "run a tab" at that time.

The final defense witness was Charles Fenderson, who had been charged along with the defendant with the armed robbery of a nearby Derby station in Murphysboro on the same evening as the Texaco station robbery. After pleading guilty to the armed robbery of the Derby station, Fenderson testified that he and another man named Larry Parker had left the Square in the defendant's car "a little before six" on November 24 on their way to Murphysboro. In Murphysboro the two robbed the Derby gas station but did not commit a second robbery. They then returned to Carbondale and parked the defendant's car on a side street across from the Palms. Upon entering the Palms, Fenderson saw the defendant, who appeared to be drunk.

Fenderson stated that between 8 and 8:30 that night he saw Parker carrying "an orange and white striped towel concealing some-

thing." Parker took the item to the defendant's car and put it inside on the passenger side.

On cross-examination, Fenderson stated that, at about 7:30 p.m. on November 24 he left the Square with the defendant, Parker and another individual. The four drove to a neighborhood in Carbondale, where they discussed committing a burglary. After deciding that the break-in was not well planned, the group returned to the Palms.

At the close of the evidence, the jury found the defendant guilty of the armed robbery of James Clough. A sentencing hearing was held at which the State presented evidence that the defendant had been convicted of three previous armed robberies in 1964, 1969, and 1975. Based upon this evidence, the court found that the defendant was a habitual criminal and sentenced him to imprisonment for natural life.

On appeal from this conviction and sentence, the defendant contends that the evidence at trial was insufficient to prove beyond a reasonable doubt that he committed the offense charged. He asserts initially that the identification testimony of eyewitness James Clough was uncertain and hesitant, resulting from an inadequate opportunity for observation, and that there was a significant discrepancy between the robber's age and appearance, as described by Clough, and the defendant's actual age and dress at the time he was arrested. The defendant contends that since this identification testimony was "less than positive," the testimony of his five alibi witnesses cannot be disregarded.

It is well settled that the testimony of a single identification witness, if positive and credible, is sufficient to support a conviction. (*People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915.) Precise accuracy in the description of an assailant is not necessary where a witness is able to make a positive identification under conditions adequate for observation (*People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907), and any discrepancies in a description go to the weight of the identification testimony to be evaluated by the trier of fact. *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915.

In the instant case, eyewitness Clough observed the defendant face-to-face at close range for a period of at least 10 seconds. According to his testimony, the area was illuminated from several sources, which, when combined, provided adequate lighting for the witness to make a detailed description of the defendant. With the exception of his age, the defendant's physical characteristics matched the description given by Clough, and even this discrepancy was understandable given the fact that the defendant's face was covered by a beard and

was not illuminated by direct lighting. Further, while Clough's description of the robber's clothing varied from what the defendant was wearing when he was arrested, the defendant could very well have changed his clothing after the robbery before going to the Palms Lounge later that evening.

■ Despite Clough's initial hesitancy in identifying the defendant's photograph from those shown him, it was Clough who contacted the police a few hours later to inform them that his identification was positive. This identification occurred only three days after the robbery, while the victim's memory of the robber was still fresh. At trial Clough explained the reason for his initial reluctance to identify the defendant and positively identified the defendant as the person who had robbed him. The jury was justified in accepting Clough's explanation and his identification testimony and, conversely, was not obligated to believe the alibi testimony offered by the defendant (see *People v. Myatt* (1978), 66 Ill. App. 3d 642, 384 N.E.2d 85). The jury's determination of the weight and credibility of the witnesses' testimony was not so improbable as to raise a reasonable doubt of the defendant's guilt (see *People v. Catlett* (1971), 48 Ill. 2d 56, 268 N.E.2d 378; *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915), and we will not overturn its verdict on this basis.

The defendant argues further that even if the identification testimony was sufficient, the evidence failed to show that he was actually armed so as to establish the use of a dangerous weapon necessary for a conviction of armed robbery. (See Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a).) The defendant asserts that under *People v. Skelton* (1980), 83 Ill. 2d 58, 414 N.E.2d 455, an objective rather than a subjective test must be applied in determining whether an item used in a robbery constituted a deadly weapon for purposes of the statute. The defendant contends that since the robbery victim here never actually saw a weapon or anything from which he could infer the presence of a weapon, the victim's subjective opinion that the item in the defendant's hands was a weapon was insufficient.

While the defendant correctly states the rule of *Skelton* that a victim's subjective belief as to the dangerousness of a weapon used in a robbery is insufficient, there is no question here as to the dangerous nature of the sawed-off shotgun recovered from the defendant's car. (*Cf. People v. Skelton* (1980), 83 Ill. 2d 58, 414 N.E.2d 455 (toy plastic gun not a dangerous weapon as a matter of law).) Rather, since the weapon allegedly used in the robbery was not actually seen by the victim, the issue is whether the defendant was in possession of the gun during commission of the robbery. See *People v. Fiala* (1980), 85 Ill.

App. 3d 397, 406 N.E.2d 931.

The presence of a weapon during commission of a robbery, necessary to a conviction for armed robbery, may be established by circumstantial evidence (*People v. Dunivant* (1981), 96 Ill. App. 3d 62, 420 N.E.2d 1110), and a conviction for armed robbery may be sustained even though the weapon itself was neither seen nor accurately described by the victim. (*People v. Elam* (1972), 50 Ill. 2d 214, 278 N.E.2d 76; *People v. Grant* (1982), 104 Ill. App. 3d 551, 432 N.E.2d 1200; *People v. DuPres* (1979), 69 Ill. App. 3d 260, 387 N.E.2d 391.) Some physical manifestation of a weapon is required, however, or some other evidence from which the presence of a weapon may be inferred. *People v. Dunivant* (1981), 96 Ill. App. 3d 62, 420 N.E.2d 1110.

■ In the instant case, the victim stated that the defendant confronted him with "something orange" that he was holding in both hands. The defendant pointed the orange object at the victim's face while ordering him to stay put and remain calm. The victim's belief that the defendant was threatening him with "some type of weapon" was substantiated by the later recovery from the defendant's car of a sawed-off shotgun wrapped in an orange towel. Thus, although no weapon was actually viewed by the victim during the confrontation with the robber, it may be concluded from the manner in which the orange object was held during the robbery and from the later discovery of an object matching that description in the defendant's car, that the "something orange" used in the robbery was in fact the sawed-off shotgun wrapped in an orange towel.

The facts of the instant case make it distinguishable from *People v. Fiala* and *People v. Dunivant*, cited by the defendant, in which there was insufficient evidence as to the presence of a weapon during the robberies in question. In *People v. Dunivant*, the victim saw nothing in the robber's hand nor anything indicating a concealed weapon, and the defendant, who was later found with a gun, was not observed at the scene of the robbery. By contrast, the defendant here was identified as the perpetrator of the robbery, and the evidence showed his possession of an object that seemed to be a weapon and that was, indeed, later found to be so. In *People v. Fiala*, there was no evidence of a concealed weapon, and a witness testified that no gun was seen in the defendant's hands, which were both visible at one point in the robbery. Further, there was evidence that the defendant could have obtained the gun in his possession upon arrest after the robbery had been completed. The instant case, however, is more like *People v. Elam*, where the victim's belief that the defendant possessed a

weapon at the time of the robbery was borne out by the later discovery of a knife in his pocket. In affirming the defendant's conviction for armed robbery, the court stated that "the actual existence of a dangerous weapon in the possession of the accused at the time of the robbery was sufficient to fulfill the [statutory requirement of a dangerous weapon] even though the weapon itself was neither seen nor accurately described by the victim." (*People v. Elam* (1972), 50 Ill. 2d 214, 220, 278 N.E.2d 76, 77.) Similarly, the presence of a weapon here was established by circumstantial evidence of something pointed at the victim like a weapon that matched the description of the dangerous weapon found in the defendant's car. This, along with evidence that the defendant's car was observed near the scene of the robbery shortly before its occurrence and that the shotgun and towel were found in the car when Detective Strom located it less than an hour and a half after the offense, was sufficient evidence from which the presence of the gun during the robbery could be inferred. For this reason, we do not address the defendant's further contention that the evidence failed to show even the threat of "imminent use of force" necessary to a conviction of robbery.

The defendant next contends that the trial court improperly permitted the prosecution to impeach Sandra Coleman with her prior inconsistent statement and to make substantive use of her statement in presenting its case. The defendant asserts that since impeachment by prior inconsistent statement was limited to occurrence witnesses under the rule governing hostile witnesses in effect at the time of the defendant's trial (73 Ill. 2d R. 238; *cf.* 87 Ill. 2d R. 238 (occurrence-witness limitation removed by amended rule)), such impeachment of Sandra Coleman, a nonoccurrence witness, was error. The defendant argues further that where the testimony of Sandra Coleman was not damaging but merely disappointing to the prosecution's case, the use of her prior inconsistent statement was unnecessary and resulted in unsworn testimony being presented to the jury as substantive evidence of the defendant's guilt.

■ While we agree with the defendant's position that impeachment of Sandra Coleman by proof of her prior inconsistent statement was improper, we do not believe the defendant was prejudiced thereby, and we accordingly deem the error harmless. Sandra Coleman's prior statement that the defendant had returned home briefly at 7:40 p.m. on the night of the robbery, brought out by the prosecution after she testified at trial that the defendant had not returned home that evening, added nothing to the evidence against the defendant regarding his involvement in the armed robbery. (*Cf. People v.*

*Taglia* (1983), 113 Ill. App. 3d 260, 446 N.E.2d 1276 (witness' prior statement that defendant was present at scene of crime with gun in his hand after shot was heard was prejudicial where given substantive effect by jury); *People v. Chitwood* (1976), 36 Ill. App. 3d 1017, 344 N.E.2d 611 (convictions reversed where court's witness impeached by highly prejudicial prior statements that defendants had admitted their guilt to her).) Where this statement, at most, contributed to the inconsistencies otherwise present in the testimony of the defendant's alibi witnesses, we decline to find that its admission constituted reversible error.

■ The defendant finally challenges the constitutionality of the statute relating to habitual criminals (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1), under which he was sentenced to a mandatory term of life imprisonment. The defendant asserts initially that this provision requires that a defendant convicted of his third armed robbery receive a sentence in excess of that provided for one convicted the same number of times of the more serious offense of murder (see Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)) and thus constitutes a denial of due process under article I, section 2, of the Illinois Constitution. While, as the defendant notes, the seemingly mandatory language of section 5—8—1(a)(1)(c) was construed as permissive in *People v. Taylor* (1983), 115 Ill. App. 3d 621, 450 N.E.2d 1256, the supreme court recently modified that decision, holding that the provision for a mandatory life sentence upon the conviction of more than one murder was constitutional (*People v. Taylor* (1984), 102 Ill. 2d 201). Since under section 5—8—1(a)(1)(c) a life sentence is mandated upon the conviction of more than one murder, there is no disparity between that sentencing provision and section 33B—1 relating to habitual criminals, and the defendant's due process argument is without merit.

While the defendant argues further that section 33B—1 violates article I, section 11, of the Illinois Constitution in that it precludes the exercise of judicial discretion in imposing sentence, this argument has been considered and likewise rejected in *People v. Withers* (1983), 115 Ill. App. 3d 1077, 450 N.E.2d 1323, *cert. denied* (1984), 465 U.S. 1052, 79 L. Ed. 2d 726, 104 S. Ct. 1332, and *People v. McNeil* (1984), 125 Ill. App. 3d 876, 466 N.E.2d 1058. As discussed above, the supreme court in *People v. Taylor* upheld a similar provision mandating a life sentence upon conviction of more than one murder on the grounds that it did not violate article I, section 11, of the Constitution. We adopt the reasoning of these decisions and accordingly find no merit in the defendant's argument of the unconstitutionality of section 33B—1 relating to habitual criminals.

For the foregoing reasons, the judgment of the circuit court of Jackson County is affirmed.

Affirmed.

HARRISON and KARNS, JJ., concur.