THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM GLOVER *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 85—2972, 85—3374, 86—0359 cons.

Opinion filed August 3, 1988.

Steven Clark, of State Appellate Defender's Office, of Chicago, for appellant Marcus Hunter.

Randolph N. Stone, Public Defender, of Chicago (Kathleen M. Pantle, Assistant Public Defender, of counsel), for other appellants.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Patricia Y. Brown, James M. Sullivan, and Inge Fryklund, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WHITE delivered the opinion of the court:

A jury found defendants William Glover, Marvin Barber, David DuPree, Marvin Bryant, and Marcus Hunter guilty of armed robbery, home invasion, and aggravated battery. The trial court sentenced Glover and Barber to terms of imprisonment of 20 years for armed robbery and home invasion and five years for aggravated battery, the sentences to run concurrently. The court sentenced DuPree to concurrent terms of 15 years, 15 years and 5 years on the three charges, and it sentenced Bryant and Hunter to natural life imprisonment. Glover, DuPree, and Barber appeal from their convictions, Hunter appeals from his sentence, and Bryant appeals from both his conviction and his sentence.

On December 7, 1984, shortly before 1 a.m., Officer John Fason of the Chicago police department received a radio assignment which directed him to go to 3735 South Ellis. Eddie Morris operated a club on the first floor and in the basement of the building at that address, and Morris lived with his family on the second floor. When Fason arrived at that address he saw a woman on the second floor indicating that he should enter. Fason kicked in the door and he and two other officers entered. He ordered everyone to get on the floor. One person, Glover, remained standing. He said that he had been robbed and he had not done anything. After speaking with other persons at the scene, Fason arrested Glover. Fason found a loaded gun behind a video game. One officer arrested Hunter inside the club, and another officer recovered a .32 caliber gun from a vent next to the bar on the first floor.

Officer Robert Andler arrived a few minutes after Fason broke the door in, and as he pulled up, Andler saw a man run out of the building. Andler saw other police officers looking for that man, and one of those officers found DuPree lying on the ground between the garbage cans and the shrubs of a nearby house. That officer arrested DuPree, and he found $350 in small bills when he searched DuPree. An officer also found a carbine pistol in the shrubs next to the building. Other officers saw Bryant and Barber running down the street away from the club, and the officers chased them for a few blocks before they succeeded in arresting them. The officers found several articles of jewelry when they searched Bryant.

At trial Clarence Spears testified that after midnight on December 7, 1984, while he was playing a video game on the first floor of the club, he saw DuPree and Barber enter the club. He noticed that Barber had a gun in his hand. Barber went to the bar, took money

out of the cash register, and took cigarettes from behind the bar. Du-Pree blocked the front door, so Spears went to the back staircase, which led to the basement. In the basement he saw people lined up facing the wall with their hands on the wall. He saw Glover holding a small revolver and Bryant holding a larger gun which he identified as one of the guns which the police later recovered. Glover told people one at a time to step away from the wall, then he searched them and took their valuables. Spears saw Glover search Alfred Johnson. After he finished and started searching another person, Glover called Johnson back and said, "You holding back." He took Johnson's watch and he struck Johnson with his gun, which discharged. When Glover had finished taking money and jewelry from everyone in the basement he said, "Don't nobody come out the room until ten minutes." He broke the lights and then he and Bryant went upstairs. Spears identified a gun which police recovered at the scene as the gun which Barber carried, and he identified a gold cross which police found in Bryant's pocket as the cross which Glover took from Spears.

Wade Curry testified that he was in the kitchen on the first floor after midnight on December 7, 1984, when he saw Hunter with a gun pointed at the head of a woman who worked in the club. Hunter told Curry to open the door to the basement and go downstairs. The woman followed Curry and Hunter followed her, keeping the gun pointed at her. Curry saw Glover and Bryant in the basement. Hunter went upstairs after asking someone where Eddie Morris was. Glover told everyone to get against the wall. He took Curry's money and jewelry and then he told him to stand against the opposite wall. Curry saw Glover strike Johnson with his gun and he saw the gun discharge. He also saw Glover strike Norman Jeter with a gun because Jeter took too long to remove his jewelry. DuPree came down to the basement, also carrying a gun, and he left with Glover and Bryant when Glover broke the lights. Curry identified guns which the police recovered as the guns which Hunter and Bryant carried that night.

Norman Jeter testified that he was in the basement of the club on December 7, 1984, when he saw Bryant enter and look around the room. Bryant left and he returned shortly thereafter carrying a gun. He cocked the gun and said, "You all know what this is." Jeter testified that Glover came in carrying a pistol and announced: "[T]he Blackstone Rangers is here now. *** [E]verybody get up against the wall." Defendants objected and the court overruled the objection. Jeter's description of the robbery mostly corroborated Curry's testimony. Alfred Johnson and Larry Niles further corroborated Curry's description of the robbery, and Johnson added that he fell to the floor

and passed out when the gun with which Glover hit him discharged. He stood up again a few minutes later. He has lost all vision in one eye and part of the bullet remains lodged in his head.

Rosalind Morris, Eddie's wife, testified that after midnight on December 7, 1984, while she was sitting in her kitchen, Hunter came into the kitchen carrying a pistol, ripped the phone off the wall, and asked Rosalind where Eddie was. She told him Eddie was at the back. Hunter pointed the gun at her head and walked next to her to the back of the house. Rosalind knocked on the bathroom door. When Eddie opened it Hunter pushed his way into the bathroom and then he took Rosalind and Eddie back to their bedroom. Hunter asked, "[W]here's the money?" Eddie and Rosalind insisted that they did not have any money. Hunter took another phone off the bedroom wall, and then he took a bank full of quarters, an answering machine, some money and jewelry, and put them in a pillowcase. He told Eddie to go downstairs but he left Rosalind in the bedroom to get dressed. He took the pillowcase and he told Rosalind he would come back in a minute to get her. Once he got downstairs, Rosalind picked up another telephone in the bedroom, which looked like a corkboard and not like a telephone, and dialed 911. She told police that an armed man was robbing her home. Shortly thereafter she saw a police car pull up and she went to the window and waved to the officers. Barber came to her bedroom carrying a gun and he asked her if she was dressed yet. He saw the police cars out front. He said, "The bitch done called the police," and started to run.

Eddie Morris' testimony substantially corroborated Rosalind's account. Eddie testified that when Hunter took him downstairs he saw Bryant taking cigarettes and whiskey from the bar. The police came in and told everybody to get on the floor. Eddie admitted that police had raided his club more than 50 times, charging Eddie with keeping a disorderly house, keeping a gambling house, and selling liquor without a license. Defendants sought to introduce evidence and cross-examine Eddie regarding a charge of unlawful use of weapons. The court did not allow the evidence or questions concerning the charges on cross-examination.

■ On appeal from their convictions, defendants Glover, Barber, DuPree and Bryant argue that the trial court committed reversible error when it improperly restricted cross-examination of Eddie Morris. Even if the court's restriction of Eddie's cross-examination was improper, we find that the error was not prejudicial. The evidence against the defendants was overwhelming, as there were seven eyewitnesses to the robberies whose accounts of the incident substan-

tially agreed in all essential respects. Eddie's testimony was not crucial for the conviction of any of the defendants. Moreover the impeachment evidence would have been cumulative, since Eddie admitted that he had been arrested frequently on several charges, and defense counsel capably pointed out other inconsistencies and implausibilities in Eddie's testimony. Therefore, we hold that any error in the restriction of the cross-examination of Eddie Morris was harmless. *People v. Carlson* (1982), 92 Ill. 2d 440, 449-50, 442 N.E.2d 504.

█ The same four defendants also contend that the trial court committed reversible error when it allowed Jeter to testify that Glover said "[T]he Blackstone Rangers is here now." Defendants maintain that this reference to gang affiliation was extremely prejudicial. Jeter's testimony regarding the statement was competent evidence since the statement was part of the *res gestae*: it was "a verbal act, illustrating, explaining or interpreting other parts of the transaction of which they [were] themselves a part." (*People v. Willson* (1948), 401 Ill. 68, 75, 81 N.E.2d 485.) "Whether the prejudicial effect of the evidence outweighs the probative value is a decision left to the discretion of the trial court." (*People v. Johnson* (1981), 97 Ill. App. 3d 1055, 1068, 423 N.E.2d 1206, *cert. denied* (1982), 455 U.S. 951, 71 L. Ed. 2d 667, 102 S. Ct. 1457.) We cannot say that the trial court abused its discretion when it decided to allow Jeter to testify regarding the statement which Glover made when he began the robbery. Therefore, we affirm the convictions of defendants Glover, Barber, DuPree, and Bryant.

█ Defendants Hunter and Bryant challenge the constitutionality of section 33B—1 of the Criminal Code of 1961 (hereinafter Habitual Criminal Statute) (Ill. Rev. Stat. 1983 ch. 38, par. 33B—1), which provides that every offender who is convicted of three Class X felonies, separated in the manner stated in the statute, in a 20-year period, must be sentenced to natural life imprisonment. Since Hunter and Bryant had each been twice convicted of armed robberies, which are Class X felonies, the trial court observed that it had no discretion, and, accordingly, it sentenced both defendants to natural life imprisonment. Defendants contend first that the statute violates article I, section 11, of the Illinois Constitution of 1970, which provides:

> "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

Our supreme court stated that this section "is applicable to the legislature as well as to the courts. *** Thus section 11 requires the legislature, in defining crimes and their penalties, to consider the con-

stitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense." (*People v. Taylor* (1984), 102 Ill. 2d 201, 205-06, 464 N.E.2d 1059.) In *Taylor* our supreme court rejected a challenge to the constitutionality of the statute, which requires a minimum sentence of natural life imprisonment for persons convicted of more than one murder. The court held that "the legislature considered the possible rehabilitation of an offender, as well as the seriousness of the offense of multiple murders, in determining that in the public interest there must be a mandatory minimum sentence of natural life imprisonment. The rehabilitative objective of article I, section 11, should not and does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes ***." (*Taylor*, 102 Ill. 2d at 206.) We hold that the legislature properly exercised its authority when it determined that in the public interest, any person who committed Class X felonies on three separate occasions must be sentenced to natural life imprisonment. See *People v. Withers* (1983), 115 Ill. App. 3d 1077, 1090-91, 450 N.E.2d 1323, *cert. denied* (1984), 465 U.S. 1052, 79 L. Ed. 2d 726, 104 S. Ct. 1332; *People v. Washington* (1984), 125 Ill. App. 3d 109, 116, 465 N.E.2d 666; *People v. Morissette* (1986), 150 Ill. App. 3d 431, 443-44, 501 N.E.2d 781.

■ Similarly, we find that the natural life sentence does not constitute cruel and unusual punishment in violation of the eighth amendment of the Constitution of the United States, and the statute does not violate the due process clause of the fourteenth amendment to the Constitution. (*Rummel v. Estelle* (1980), 445 U.S. 263, 285, 63 L. Ed. 2d 382, 397-98, 100 S. Ct. 1133, 1145; *Withers*, 115 Ill. App. 3d at 1088-90.) *Solem v. Helm* (1983), 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001, is not to the contrary; in that case the Supreme Court found a sentence of life imprisonment without parole unconstitutional because the defendant had committed only nonviolent crimes. (463 U.S. at 296-97, 77 L. Ed. 2d at 653, 103 S. Ct. at 3013.) The court found that life imprisonment constituted cruel and unusual punishment for such crimes. (463 U.S. at 303, 77 L. Ed. 2d at 658, 103 S. Ct. at 3016.) Under the Illinois statute the defendant must be sentenced to life imprisonment if he has committed three Class X felonies, and Class X felonies involve the use of force or threat of force. In the case at bar, Hunter had been convicted of five other armed robberies and Bryant had been convicted of two prior armed robberies. We find that the sentence of natural life imprisonment for the armed robberies herein does not constitute cruel and unusual pun-

ishment in view of defendants' repeated commission of these serious crimes in a relatively short period of time. See *People v. Hartfield* (1985), 137 Ill. App. 3d 679, 691, 484 N.E.2d 1136.

Defendants next contend that the Habitual Criminal Statute is unconstitutional in that it denies defendants adequate notice of the State's intention to seek a natural life sentence. This argument was considered and rejected in *People v. Washington* (125 Ill. App. 3d 109), on grounds that the State gave defendant notice that he would be subject to all possible penalties when he was charged with the crime. (125 Ill. App. 3d at 115.) We agree, and we also agree with that court's grounds for rejecting a challenge based on the rule stated in *People v. Hayes* (1981), 87 Ill. 2d 95, 429 N.E.2d 490. In *Hayes*, our supreme court found that prior convictions must be proved beyond a reasonable doubt, after notice to the accused and a reasonable opportunity to refute the allegation of prior convictions, when those convictions are used to increase the degree of an offense from a misdemeanor to a felony. (87 Ill. 2d at 98.) In the case at bar, as in *Washington*, the trial court held a sentencing hearing at which the State proved that defendants had been convicted of prior Class X felonies. The State presented 11 witnesses, police officers and Department of Corrections personnel, who assisted in the identification of defendants as the persons who had been convicted of the earlier armed robberies. This hearing was sufficient to conform with the rule in *Hayes*. See *Washington*, 125 Ill. App. 3d at 115.

Defendants next argue that the Habitual Criminal Statute violates the separation of powers provisions of the Illinois Constitution because it grants the prosecutor unbridled discretion to determine whom to sentence to natural life imprisonment. The provisions of the statute apply to every offender who has been convicted of two prior Class X felonies within the times specified by the statute. (*People v. McNeil* (1984), 125 Ill. App. 3d 876, 881, 466 N.E.2d 1058.) The statute provides very precise guidelines for its application. The fact that the prosecutor may decide not to present evidence of prior felonies even when the defendant has the requisite convictions does not grant the prosecutor the power to sentence, nor does it render the statute unconstitutional. As the Supreme Court has stated: "Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution." (*Gregg v. Georgia* (1976), 428 U.S. 153, 199, 49 L. Ed. 2d 859, 889, 96 S. Ct. 2909, 2937.) The Illinois courts have found, therefore, that the Habitual Criminal Statute does not unconstitutionally infringe upon the judicial power. *McNeil*, 125 Ill. App. 3d at 880-81; *Withers*, 115 Ill. App. 3d at 1087-88.

■ Finally, defendants contend that the Habitual Criminal Statute violates the constitutional proscriptions against *ex post facto* laws and double jeopardy. Illinois courts have consistently held that the statute does not place defendant in double jeopardy, and it does not act as an *ex post facto* law, because it prescribes punishment only for the most recent crime, which must have been committed after the statute went into effect. The evidence of prior crimes is used solely to augment the penalty for the last crime. *McNeil,* 125 Ill. App. 3d at 882; *Washington,* 125 Ill. App. 3d at 117; *People v. Mason* (1983), 119 Ill. App. 3d 516, 524, 456 N.E.2d 864.

All of defendants' objections to the constitutionality of the Habitual Criminal Statute have been considered and rejected by Illinois courts repeatedly in recent years. We find no sufficient grounds for overruling these decisions. Therefore, the sentences of natural life imprisonment imposed on defendants Hunter and Bryant are affirmed. We affirm the convictions of Glover, Barber, DuPree and Bryant for the reasons stated above.

Affirmed.

RIZZI and FREEMAN, JJ., concur.