THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARREN GRAY, Defendant-Appellant.

First District (1st Division) No. 1—86—1213

Opinion filed December 26, 1989.

Joshua Sachs, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Marie Quinlivan Czech, and Judith M. Pietrucha, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

The defendant, Darren Gray, was charged by indictment with one count of armed robbery. (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a).) Prior to trial, he filed a motion seeking to allow his attorney's participation in *voir dire*, or in the alternative, to have specific questions which he submitted propounded to the prospective jurors. The questions pertained to the prospective jurors' attitudes regarding a defendant's failure to testify. Defendant also filed a motion *in limine* to preclude the State from using defendant's two prior convictions for armed robbery as impeachment in the event he testified, or alternatively, that the State be limited to impeaching by use of the two prior convictions without specifying the nature of the convictions. The court denied both motions but did agree to use the questions submitted by defendant.

Following a jury trial defendant was convicted and sentenced to the penitentiary to a term of natural life imprisonment pursuant to the Habitual Criminal Act (Ill. Rev. Stat. 1985, ch. 38, par. 33B—1 *et seq.*). On appeal he contends: (1) that the trial court's failure to ask certain questions individually on *voir dire* to each prospective juror denied him a fair trial by an impartial jury; (2) that the trial court's denial of his motion *in limine* to preclude the State's use of prior convictions for impeachment purposes was an abuse of discretion; (3) that he was not proven guilty beyond a reasonable doubt; (4) that his right to a fair trial was denied when the State was allowed to introduce improper evidence for the sole purpose of inflaming the passions of the juror; (5) that section 5—8—1(a)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(2)), which provides for mandatory life sentence, is unconstitutional; and (6) that section 33B—1 of the Illinois Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1) is unconstitutional in that it was amended in 1980 in violation of article IV, section 8(d), of the Illinois Constitution (Ill. Const. 1970, art. IV, §8(d)).

The following pertinent evidence was adduced at trial. Nathaniel

Johnson, the 65-year-old victim, testified that on February 14, 1985, he was employed at Hilltop Food and Liquors in Chicago. He stated that he arrived there at 9 a.m. and was in the process of unlocking the door of the store when he felt something at the side of his head. He turned and saw a man holding a brown-handled .38 revolver with a dark or black barrel. Johnson testified that, although he did not recognize the offender, he did see his face. The offender told him to open the door and turn on the lights. After turning off the burglar alarm, Johnson was handcuffed and a dark scarf was tied over his eyes. The offender took his car keys, the store keys and two rings from him. The offender then took him to a storeroom in the back of the store and sat him on a box. Mr. Johnson heard the offender ransack the store; and although he never saw a second man, he heard the offender speak to someone at the back of the store.

After it became quiet and Johnson had waited 10 to 15 minutes, he was able to pull the blindfold down from his face so that he could see. He walked out through the front door, where he saw Ruby Love, who lived next door to the liquor store. He asked her to call the police. At that time he noticed that his car was missing. Shortly thereafter, the police arrived and removed the handcuffs.

On April 10, 1985, Mr. Johnson viewed a lineup at the police station, where he identified Darren Gray as the man who had robbed him on February 14. Mr. Johnson identified various exhibits, including a pair of handcuffs and a gun which were similar to those used in the robbery. He also identified the defendant in court.

On cross-examination, Mr. Johnson denied that the intruder's face was covered by a scarf or that he told this to the police. On redirect, Johnson stated that he looked at the defendant's face and that it is not hard to recall his face.

Next, Ruby Love testified that she had lived next door to Hilltop. On February 14, at approximately 9 a.m., she was brushing snow off her car when she saw Mr. Johnson go to the house next to hers and pick up the keys to the store. She usually saw him between 8:45 and 9 a.m. She testified that she saw two men in a car stop in front of the store as Johnson was unlocking the front door. Ms. Love knew the defendant and saw him almost daily hanging out in front of the store. He was wearing a scarf which covered the bottom part of his face and a big baggy coat. She stated that she saw the defendant standing next to Mr. Johnson but did not see a gun.

After brushing the snow from her car, Ms. Love went inside for 30 to 40 minutes. When she went back outside, she saw Mr. Johnson with a scarf tied around his face and his hands handcuffed behind his back.

Johnson told her he had been robbed. Ms. Love took him inside her house and called the police. However, she did not speak to the police until a couple of days later because she did not want to get involved. Thereafter, she selected defendant's photograph from a group of pictures.

On cross-examination, Ms. Love denied identifying herself to the police as Mary Scott. She admitted telling defense investigators, eight months later, that she saw "some boys" going into the store with Mr. Johnson but denied saying that they had stockings on their faces.

Chicago police officer Daniel Sheehan testified that on the morning of February 14, 1985, he and his partner received an assignment to Hilltop Liquors. Upon arrival there he removed the handcuffs from Mr. Johnson and inventoried them with the police department. He testified that the handcuffs were stamped with the words "STOP" and "TAIWAN." He described the store as "a mess," and Mr. Johnson's condition at the time as "upset."

On cross-examination, Officer Sheehan acknowledged that Mr. Johnson told him although there were two men at the scene, he only saw the one who put the gun to his head. The officer did not remember seeing the scarf.

Next, Richard Leftridge, one of the owners of the store, testified that he arrived at the store at 10:30 a.m., after the robbery. He was missing some liquor and cigarettes valued at approximately $400. Mr. Johnson showed him the scarf that was used as a blindfold. He immediately recognized it because he had seen the defendant, as well as his girlfriend, Ramona, wearing it. He sent his son to Ramona's house to return the scarf.

Detective Peter Dignan testified that he spoke with the owners of the store and also interviewed Ruby Love under an "anonymous relationship" because she did not want to give her name. He returned to Ms. Love's home three or four days after the initial interview, at which time she selected the defendant's photograph from an array of approximately 10 photographs.

Officer Armstrong testified that he arrested the defendant on March 3, 1985, after a traffic accident in which the defendant was charged with negligent driving and driving without a valid license. As he stood next to the defendant's car, he saw a gun in a canvass bag in the back seat. He also found ammunition, a pair of handcuffs and a calculator, which he inventoried.

Detective Joseph Danzl testified that he conducted a lineup on April 10, 1985, at which time Mr. Johnson identified the defendant as the man who had robbed him on February 14, 1985.

Nacy Antoine, an investigator with the public defender's office, testified for the defense. He stated that he and his partner interviewed Ruby Love on October 10, 1985, at which time she told them she had seen "two men going into the store with Nathaniel Johnson" who had "stockings over their faces." He further testified that Ms. Love told him she did not like the defendant. On cross-examination, Mr. Antoine testified that he works closely with Mr. Green, defense counsel, that he had reviewed the police reports and that he had instructions from Mr. Green that these witnesses would have to be impeached.

Ramona Harrell (Ramona) testified as an alibi witness. She testified that she has known the defendant for 14 years and had been his girlfriend since 1983, except for a time in August 1984 when she dated Nathaniel Johnson. She related that on the evening of February 14, 1985, she went with the defendant, Danny Profit and a man named Edward to a small party at the apartment of Profit and Diane (Dee-Dee) Williams. They first stopped at a liquor store and later arrived at the apartment at approximately 8:30 p.m. The group remained at the apartment overnight. When Ramona awoke at 9:30 a.m. the next morning, DeeDee had left for work; but everyone else, including defendant, remained at the apartment all day, except for a trip to a liquor store in the afternoon. She testified that she left the apartment at approximately 9:30 p.m. When she arrived home she was told that someone from the liquor store had brought a scarf to their house. She denied that the scarf belonged to her.

Next, Diane (DeeDee) Williams testified. Her testimony was substantially the same as Ramona's testimony. She related that she took everyone home the evening of February 14. On cross-examination, DeeDee stated that although her husband was employed at the time of the robbery and worked from 8 a.m. to 5 p.m., he probably did not work on February 14. She did not wake anyone before she left for work, not even the children for preschool. However, her husband must have taken them to school during the day because she remembers picking them up from school that evening. She testified that Edward is her brother and that she has known the defendant since 1979.

Gladys Harrell testified that on February 14, 1985, two men came to her house looking for her daughter, Ramona, or the defendant, saying one of them had left a scarf at the liquor store. Although she had never before seen the scarf, she took it and left it on a table by the door.

In rebuttal, Mr. Johnson testified that he had never dated or had a relationship with Ramona Harrell. On cross-examination, he denied ever having gone to a motel with her. Officer Danzl testified that when

he spoke with the defendant after his arrest, the defendant did tell him about a party on the 13th of February and at the time of the robbery. However, on cross-examination, he conceded that he did not reduce the defendant's statement to writing.

In surrebuttal, Ramona related that in September of 1984 she had been involved in a sexual relationship with Nathaniel Johnson. After closing arguments were heard and the jury was instructed, the jury returned a verdict of guilty of armed robbery. After a hearing on the State's petition to sentence the defendant as a habitual criminal based on his two prior armed robbery convictions, the court sentenced the defendant to natural life in prison.

I

Defendant first maintains that the trial court failed to ask three *voir dire* questions which go to the heart of a particular bias or prejudice, and therefore, denied him a fair trial by an impartial jury.

In *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062, the supreme court held that to insure the selection of a fair and impartial jury, the jurors should be questioned concerning the presumption of innocence, the burden of proof, and the defendant's right to remain silent. *Zehr*, 103 Ill. 2d at 477.

In the instant case, prior to the jury selection, the defendant made a motion for attorney participation in *voir dire*, or in the alternative, to have the court question the venire from a list of written questions he submitted, which included the *People v. Zehr* questions. Although the motion for attorney participation was denied, the trial judge noted that he had considered the requested questions and stated "that virtually all of the questions are *** put by me to prospective jurors in each case." The court then addressed the venire *en masse*, stating that Mr. Gray was presumed innocent of the charge and it was the State's burden to prove him guilty beyond a reasonable doubt. Further, the court explained that if the State failed to prove the defendant guilty, the jury must return a verdict of not guilty and that the defendant's failure to testify could not be held against him.

While the defendant recognizes that the court made these admonishments, he still maintains that the court did not sufficiently satisfy *People v. Zehr*. He maintains that failure to question prospective jurors individually or in smaller panels, coupled with the court's generalized charge posed in a single question, was inadequate to insure the constitutional protections afforded defendants under *People v. Zehr*. Defendant argues this approach was inadequate to flush out the type of prejudice the *People v. Zehr* questions were designed to expose, citing to

*People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137, for the proposition that *People v. Zehr* dictates that any potential prejudice would be uncovered, where for example, in addition to the pre-*voir dire* generalized charge, the court also makes specific inquiries to the individual panels.

The defendant correctly states the principles and constitutional protections the *Zehr* questions are intended to provide in the selection of a fair and impartial jury. However, *People v. Zehr* is not meant to be interpreted so narrowly. The State's argument is more persuasive. It is clear from the record that the questions submitted by the defense counsel were addressed by the trial court. Further, the court on *voir dire* explained the nature of the indictment, the defendant's presumption of innocence, the State's burden of proof and that the jury could not hold it against the defendant if he chose not to testify on his own behalf. The court then inquired if anyone had any problems or reservations concerning any of these principles. Moreover, the court also informed the venire that they would receive instructions of the law applicable to the facts of the case. The court did in fact so instruct the jury at the close of the evidence and closing arguments. Although the *People v. Zehr* court did not specifically mandate the manner in which the questions should be posed, our supreme court has since held that a generalized question to the jurors as a whole is sufficient to ensure that the venire harbored no prejudices. *People v. Emerson* (1987), 122 Ill. 2d 411, 522 N.E.2d 1109.

In *People v. Emerson*, the trial judge instructed the prospective jurors in general statements that it would be their obligation to follow the law as he told them to do and inquired about their ability to do so. The prospective jurors all indicated yes. Later he discussed with them generally the principles regarding the presumption of innocence. Our supreme court determined that the trial court had complied with the requirements of *People v. Zehr*. Likewise, in the case at bar, the trial court addressed the venire generally and touched upon each of the *People v. Zehr* questions, inquiring if any prospective juror had a problem adhering to those principles. No juror indicated that he or she had any reservations about following those concepts. Accordingly, we follow the dictates of the supreme court and reject the defendant's argument.

## II

Defendant next maintains that the trial court abused its discretion when it denied his motion *in limine* to preclude the State from impeaching him with his two prior armed robbery convictions, or alterna-

tively, to only allow the State to inform the jury of the unspecified prior convictions. He argues that as a result of the court's ruling, he did not testify at trial.

■■ The law is well settled in Illinois that a defendant's prior conviction is admissible for impeachment purposes and proper in the exercise of sound discretion of the trial court where (1) the conviction involved a crime which is punishable in excess of one year or involves dishonesty or a false statement; and (2) the trial judge determines that the probative value of the conviction outweighs the prejudicial effect. *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.

In the instant case, the convictions were of felonies which were less than 10 years old. Thus, the State maintains that use of the prior convictions met the requirements set forth in *People v. Montgomery.* Further it asserts the crime of armed robbery relates directly to credibility and veracity. *People v. Hancock* (1982), 110 Ill. App. 3d 953, 955, 443 N.E.2d 226.

Conversely, defendant maintains that a trial court is required to balance the competing value of admitting a defendant's prior conviction for impeachment against the danger of any unfair prejudice to the defendant *(Montgomery,* 47 Ill. 2d 510), because a jury is likely to convict a defendant based on his prior bad acts rather than the evidence introduced against him at trial. *(People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) The defendant further maintains that the decision to admit a prior conviction for the same conduct for which defendant is on trial must be carefully weighed by the trial court *(Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936), to ensure that the prejudicial effect does not outweigh introduction of the evidence which would lead jurors to the natural conclusion that "if he did it before, he probably did so this time." *People v. Siebert* (1979), 72 Ill. App. 3d 895, 903, 390 N.E.2d 1322.

Defendant argues that the trial court gave absolutely no indication it was balancing the probative value of the prior convictions against any unfair prejudice that might inure to the defendant prior to denying the motion. This issue must be resolved in light of *People v. Montgomery* and the fact that the trial court has wide latitude in determining whether the probative value of a prior conviction outweighs any unfair prejudice to the defendant. In the case at bar, the record supports the conclusion that the facts regarding the prior convictions were presented to the judge before he made his ruling. Additionally, in response to defense counsel's reservation that the court's ruling would restrict Mr. Gray in his decision whether or not to testify, the judge stated that the jury would also be instructed on the limited purpose of the evidence.

The State's argument is more persuasive, that where the defendant has failed to show any prejudice, the prior conviction involves a crime which is probative of the offender's veracity and honesty as a witness and it is not mandatory that convictions for the same type of crime as charged in a case be precluded (*People v. Spates* (1979), 77 Ill. 2d 193, 495 N.E.2d 563), then the trial court committed no error in denying the defendant's motion.

■ Defense counsel phrased the motion to bar the use of evidence of a prior conviction of the defendant in the alternative: "[y]ou permit Mr. Gray to testify without impeachment of any kind," or "you permit Mr. Gray to testify and limit the impeachment." However, a defendant's decision whether to testify at trial cannot be used as a bargaining tool with the trial court regarding its determination to grant or deny the motion to preclude evidence of the prior convictions. The defendant's refusal to testify, standing alone, cannot serve as the basis for a conclusion he is prejudiced. (*People v. Leonard* (1980), 83 Ill. 2d 411, 423, 415 N.E.2d 358.) Hence, we find defendant's argument to be without merit.

III

Defendant's next contention is that the State failed to prove him guilty beyond a reasonable doubt, maintaining that the eyewitness evidence was incredible and that his alibi testimony was unimpeached. He argues that the victim's identification was based on no more than a fleeting glance; the testimony of the two occurrence witnesses was impeached; that the evidentiary value of the handcuffs found in his car at the time of his arrest is minimal; and that his alibi defense is believable. He further asserts that his conviction rests upon identification which does not produce an abiding conviction of guilt; and therefore, this court must reverse. *People v. Kidd* (1951), 410 Ill. 271, 102 N.E.2d 141.

The State counters that the identification of the defendant by the victim and his neighbor, Ms. Love, was both positive and convincing and that the alibi testimony was impeached. In addition, the cumulative effect of the physical evidence of the gun and handcuffs found in the defendant's possession at the time of his arrest linked him to the offense.

It is well established that the testimony of one identification witness is sufficient to support a conviction (*People v. Dotson* (1981), 99 Ill. App. 3d 117, 424 N.E.2d 1319), as long as the witness is credible and the accused is viewed under circumstances which would permit a positive identification to be made. See *People v. Manion* (1977), 67 Ill.

2d 564, 571, 367 N.E.2d 1313; *People v. Slim* (1988), 164 Ill. App. 3d 519, 518 N.E.2d 154.

■■ In the instant case, the victim testified that he was accosted by the defendant as he entered the store. When he turned as the gun was placed to his head, he was very close to the defendant. He was able to describe the defendant to the police immediately after the incident, identify him in a lineup two months later and make an in-court identification. Mr. Johnson described a gun which matched the description of the gun found in the defendant's possession. Further, the testimony of Ms. Love corroborated and was consistent with that of the victim. The fact that two weeks after the robbery the defendant was in possession of a weapon and handcuffs identical in appearance to those used in the incident, coupled with positive identification of the defendant by two witnesses, was more than sufficient to establish the defendant's guilt beyond a reasonable doubt. Further, any minor discrepancies in the witnesses' testimony go to the weight of the testimony as evaluated by the trier of fact. *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 615, 378 N.E.2d 1318.

## IV

The defendant maintains that the admission of evidence which is offered solely to evoke sympathy or to inflame the jury is improper (*People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436), and that the evidence of this nature has no relationship to guilt or innocence of the accused and only serves to prejudice the defendant. (*People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202.) Defendant contends that these legal principles were continually abused by the State during the trial, and the prosecutorial misconduct was so prejudicial to him that he was denied a fair trial.

The alleged improper instances of prosecutorial misconduct follow:

(1) During opening statements:

"MR. NORA [Assistant State's Attorney]: On February 14 *** Darren Gray *** took a revolver, held it to the head of a 65-year-old man, who had already suffered three heart attacks."

(2) During the direct examination and redirect examination of Mr. Johnson:

"Q. When the police got there, describe your physical condition to the—jury—when the police got there?

A. I was very weak and upset, very. I had three heart attacks and I was—.

MR. PATEL [Defense Attorney]: Objection.

THE COURT: Overruled.

Q. [Assistant State's Attorney]: Tell us exactly what you were feeling, at that time.

A. I don't know. I know I was weak and sick.

Q. Did you take time off from work after the incident?

A. Yes.

Q. How long did you take off from work?

A. I was—it was over a week. I don't know exactly.

* * *

Q. Have you been in combat before?

A. Yes.

Q. Tell us how many combat ribbons you got.

A. I have three silver stars and one bronze."

(3) During the examination of Officer Sheehan:

"Q. Now, when you say he (Johnson) was upset, what did you actually observe about him?

A. Well, he was having a hard time talking, short of breath.

Q. Did he make any complaints about his physical well being, at that time.

MR. PATEL [Defense Attorney]: Objection, Judge.

THE COURT: He may answer yes or no.

A. Yes."

(4) During closing arguments:

"MR. MORICI [Assistant State's Attorney]: On February 14, 1985, Nathaniel Johnson, a sixty-five year old man who had three heart attacks—was just walking down the street.

* * *

MR. NORA [Assistant State's Attorney]: A man (Johnson) who was scared and upset and who probably thinks about heart attacks every time his heart races a little bit fast."

Defendant asserts that the only purpose served in questioning Mr. Johnson about his health or his war record was to arouse the passions of the jury, which resulted in substantial prejudice to him. The State contends that evidence elicited from Mr. Johnson regarding his physical health and age at at the time of the armed robbery was material and was not elicited solely to incite the passions of the jury. The State claims that the case at bar is distinguishable from *People v. Bernette* and *People v. Hope*, because in those cases the objectionable comments and testimony which were elicited concerned members of the deceased victim's family. The State maintains that testimony of the victim's physical state (1) at the time of the robbery was relevant to the issue

of the victim's credibility and state of mind and (2) immediately after the armed robbery was relevant to establish the element of force.

■ Although the State's argument is persuasive and the defendant's assertions that evidence of this nature has no relationship to the guilt or innocence of the defendant are more plausible in light of the overwhelming proof of defendant's guilt, we find that any error which may have occurred from the prosecution's conduct is harmless and does not warrant reversal. *People v. Neumann* (1986), 148 Ill. App. 3d 362, 375, 499 N.E.2d 487.

V

Defendant maintains that the mandatory life sentence provision in section 5—8—1(a)(2) of the Unified Code of Corrections, which prohibits the sentencing judge from considering mitigating factors in a defendant's background, violates due process of law and the eighth amendment of the United States Constitution. He asserts that the eighth amendment requires that relevant facts and circumstances in aggravation and mitigation be considered before a defendant is permanently removed from society. (*Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954; *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978.) He also cites *Solem v. Helm* (1983), 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001, in which the United States Supreme Court held that a South Dakota recidivist statute violated the eighth amendment where Helm was sentenced to life sentence without parole after numerous nonviolent felony convictions. The defendant argues that the imposition of a life sentence is as severe a punishment as a death penalty; and when viewed in that light, the Illinois statute is unconstitutional since the defendant's individual circumstances are not considered.

The State maintains that, contrary to the defendant's assertions, *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, is dispositive of this claim. In *People v. Taylor*, our supreme court rejected the analogy the defendant draws between the death penalty and natural life in prison. In addition, the *Lockett v. Ohio* and *Woodson v. North Carolina* cases are distinguished, because they involve construction of death penalty statutes and cases construing death penalty statutes are of little assistance in determining the constitutionality of habitual offender statutes. See *Rummel v. Estelle* (1980), 445 U.S. 263, 272, 63 L. Ed. 2d 382, 389, 100 S. Ct. 1133, 1138.

■ In *People v. Withers* (1983), 115 Ill. App. 3d 1077, 1090, 450 N.E.2d 1323, 1332, this court held that the habitual offender act did not violate the eighth and fourteenth amendments because the two

previous adjudications afforded the defendant an opportunity to present mitigating factors. Additionally, the *Solem v. Helm* decision, as noted above, involved the issue of whether the imposition of a mandatory term of life imprisonment resulted in a sentence disproportionate to the crime where the defendant's prior offenses were six nonviolent felony convictions. Therefore, consistent with our prior decisions and in accord with our supreme court's pronouncement in *People v. Taylor*, we reject the defendant's attempt to rely on *Solem v. Helm*.

## VI

Defendant finally argues that his life sentence must be reversed because the statute under which he was sentenced, the Habitual Criminal Act (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1), was not amended in accordance with article IV, section 8(d) of the Illinois Constitution, which sets forth the procedural prerequisites for the passage of bills.

The State maintains that the defendant's claim is without merit and posits that this court has continually rejected this identical argument.

■ The general rule, pursuant to the Illinois Constitution, provides that all bills submitted for approval must be read by title on three different days. In *People v. Cannady* (1987), 159 Ill. App. 3d 1086, 513 N.E.2d 118, the defendant raised the exact issue presented here, *i.e.*, that the passage of the amendment to section 33B—1 of the Habitual Criminal Act in 1980 was unconstitutional. However, the *People v. Cannady* court found that the three-day reading requirement was suspended by a majority of the members of the House of Representatives pursuant to its rules and therefore no violation occurred. Furthermore, the legislature and the courts have recognized that an additional exception to the rule requiring three title readings exists wherein the amendment is germane to the original bill submitted for passage. (*Cannady*, 159 Ill. App. 3d at 1090. See also *People v. Poole* (1988), 167 Ill. App. 3d 7, 520 N.E.2d 1017.) Based upon this precedent, we conclude that the aforementioned amendment was properly passed in accordance with the Illinois Constitution.

For the foregoing reasons, we conclude the defendant's claims must fall, and we affirm the decision of the circuit court.

Judgment affirmed.

BUCKLEY and O'CONNOR, JJ., concur.