THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEROME WILSON, Defendant-Appellant.

First District (5th Division) No. 1—91—3399

Opinion filed January 21, 1994.

Rita A. Fry, Public Defender, of Chicago (Ira Sheffey, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eileen Rubin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

After a jury trial, defendant, Jerome Wilson (Wilson), was convicted of two counts of armed robbery and sentenced to natural life imprisonment under the Illinois Habitual Criminal Act. (See 720 ILCS 5/33B—1 (West 1992).) Wilson presents two issues for review: (1) whether the trial court erred in its denial of a motion *in limine* to exclude evidence relating to Wilson's arrest; and (2) whether the Illinois Habitual Criminal Act is unconstitutional.

The relevant facts are as follows.

A jury trial took place on July 18, 1991. This trial was the second to take place on these charges as the first trial had resulted in a mistrial. Prior to jury selection, both sides stipulated that the pretrial motions and arguments would be the same as they had been in the first trial. The trial court indicated its rulings on the pretrial motions would remain the same as they had been in the first trial.

One of the pretrial rulings concerned a defense motion *in limine* which sought to preclude any evidence regarding the circumstances and events which led to defendant's arrest. In ruling on the motion during the first trial, the trial court noted that as long as the evidence did not seek to prove that the defendant was a criminal or had a propensity towards crime, the reviewing court would scrutinize the reason for the admission of the other conduct. The trial court indicated the prosecution intended to attempt to adduce that defen-

dant fired shots at the police immediately before his arrest. The trial court held that defendant's motive in attempting to flee was relevant, among other things, with respect to the charges in the present case. The defense moved that the alleged hostage be precluded from testifying. The trial court ruled that if the hostage would be called by the prosecution, her testimony would be limited to his ruling and, moreover, the court would preclude the prosecution from adducing any evidence that defendant had committed another armed robbery in another establishment.

During opening argument, defense counsel did not dispute the fact that a robbery had taken place, but rather argued that Wilson did not commit the crime. Defense counsel pointed out that the crime occurred at approximately 1 a.m. and that the victims were immediately told to face a wall.

Julie Ojala (Julie) testified that on September 7, 1989, she got off work at 1 a.m. Her boyfriend, Ken Buchara (Ken), picked her up from work and the two went to a bar where they were supposed to meet some friends. Their friends were not at the bar, so Ken drove Julie home.

As they approached Julie's home, in the area of Harlem and Barry, they noticed a car with two people in it. Ken flashed his lights at the car, thinking the two people might be his friends. Since the people in the car did not look familiar, Ken drove into the alley.

Ken parked in the lot behind the building. Ken was walking Julie to her door when she heard a "ps" sound behind her. Julie kept walking looking for her keys. Julie then heard someone say, "Hey." She turned around and saw Ken, with a man behind him who looked like he was holding Ken's hair.

The man motioned for them to go back by the wall of the apartment. Julie identified Wilson as the person who had been holding Ken. At the time of the incident, Wilson was wearing a white sweatshirt, acid-washed jeans and gym shoes. The man told them to spread their hands and legs and put them against the wall. Julie and Ken complied with the man's directive. The man had a gun in Ken's back when he began to look through Ken's pockets. Julie watched him go through Ken's pockets. The man told Julie not to look at him, because if she did, he would kill her boyfriend.

The man began to frisk Julie. Among other things, he took, a gold snake necklace. He then asked if there was anybody in her house, because, he said, her house would be next. Julie told Wilson that her grandmother, brothers and sisters were at home.

The man took Julie's watch off her wrist, her purse off her hand and her ring off her finger. After searching Julie, the man walked to-

ward the alley and whistled. The man then came back and asked if she had more money. He gave Julie her purse back and told her to look for more money. While doing this, Julie felt a gun in her purse. She attempted to shoot the gun, but was unable to do so. Julie then pointed the gun towards the man and asked him if he was looking for it. The man snatched the gun away. A car pulled up, and the man got in and drove away.

Julie described the lighting conditions in the general area. She stated there was "a little roof over the front door, and there's a light there" as well as lights on both sides of Harlem. In addition, there was a dentist's office across the street that had a large white fluorescent light. There was another streetlight behind where the car was parked.

When the car drove away, Julie knocked on her apartment window and rang the bell. Her grandmother answered the door. Julie called the police and about five minutes later they arrived. The police asked Julie and Ken to take a ride with them. They went to the corner of Diversey and Sayre, where Gus' bar was located. This was about five blocks from Julie's home. When they arrived at this location, the police asked Julie to come to an ambulance to see if the person in it was the man who robbed her. While walking to the ambulance, Julie saw the gun which the robber had pulled on her lying on a patch of grass. Julie then noticed defendant's sweatshirt on the ground. Julie identified the man in the ambulance as the man who had robbed her. Subsequently, the police returned to Julie her watch, $60 in cash, her necklace and ring. The police also returned Ken's things to him.

The State also presented the testimony of Ken Buchara. Ken's testimony was substantially the same as Julie's. He identified Wilson as the person who had robbed him that night, but also admitted that Wilson was the only man who had been shown to him by the police that night. Ken testified that approximately 20 to 30 minutes elapsed between the time of the robbery and when he identified Wilson in the ambulance.

Detective Mark Sanders testified that on September 17, 1989, he responded to a call to go to Gus' Tavern at 7001 West Diversey at approximately 1:40 a.m. When he arrived, he observed Wilson start to leave the tavern with a gun in his hand. Detective Sanders identified Wilson as the person he saw that evening. The officer ordered Wilson to stop and drop his weapon. Wilson ran back into the tavern, where he put a gun to a woman's head. Wilson began to walk out of the tavern. About midway through the outside of the building, Wilson stopped and fired a shot in the air. The woman's

"knee's buckled and she went to the sidewalk." Wilson turned and fired at Sanders, grazing Sanders' left foot. Wilson began to run, but was shot by the other police officers at the scene.

Officer Sanders cuffed and searched Wilson. During the search he recovered money and jewelry. Wilson's weapon was in the grass $2^1/2$ to 3 feet from him. A few moments later an ambulance arrived and paramedics came on the scene and began to treat the defendant. The paramedics started administering to the defendant while he was still on the sidewalk. They cut away the sweatshirt he was wearing, got him on a stretcher, and put him into the back of the ambulance. The sweatshirt remained on the sidewalk. Julie and Ken were brought to the scene because they had been victims of an armed robbery about 15 minutes earlier and the defendant fit the description they had given the police. While Sanders was walking with Julie over to the ambulance, she passed the spot where the gun had fallen and immediately identified it as the one defendant had used to rob her and Ken. Julie also observed the sweatshirt and identified it as the shirt the defendant had been wearing at the time of the robbery. After viewing Wilson in the ambulance both Julie and Ken identified Wilson as the person who had robbed them. Later at the police station, Ken and Julie identified the jewelry Sanders had recovered from Wilson as belonging to them.

On cross-examination, Detective Sanders testified that Ken and Julie never observed a lineup and the only person ever shown to them was Wilson. On redirect, Detective Sanders testified that the police conducted a showup (the type of identification the police did that night), because of the exigent circumstances of the situation and due to the short time span between the crime and the apprehension of the defendant.

The defense did not present any witnesses.

After deliberation, the jury found Wilson guilty of the armed robberies of Julie Ojala and Kenneth Buchara.

I

In his first assignment of error, Wilson claims he was denied a fair trial when the trial judge refused to exclude testimony concerning his arrest. The testimony contained circumstances of Wilson committing other crimes, *i.e.*, holding a woman hostage outside the tavern where he was shot and arrested.

Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's bad character or his propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821.) Other crimes evidence is properly admitted

to show motive, *modus operandi*, knowledge, identity, absence of mistake, criminal intent, defendant's state of mind, the circumstances of his arrest, or a common design or scheme. *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85, 485 N.E.2d 1292.

Defendant argues that Wilson's identification could have easily been explained to the jury without going into the circumstances of his arrest in that Sanders could have said that he saw Wilson with the gun while omitting the details of the hostage situation and subsequent shootout. Wilson argues that the prejudicial effect of such evidence outweighs any probative value it possesses and cites the case of *People v. Diaz* (1979), 78 Ill. App. 3d 277, 397 N.E.2d 148. Defendant further argues the well settled evidentiary rule that "[e]vidence of collateral crimes *** is inadmissible if relevant merely to establish defendant's propensity to commit crimes." (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242.) The State maintains that the testimony regarding the circumstances of defendant's arrest was relevant to show the identity of the defendant and defendant's consciousness of guilt and resistance to arrest.

Both the State and Wilson are correct on the law regarding the admissibility of other crimes evidence; however, the State is correct as to its application in this case.

Other crimes evidence is properly admitted to show identity, absence of mistake, defendant's state of mind, and the circumstances of his arrest, or a common design or scheme. (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85, 485 N.E.2d 1292.) It is also relevant if such evidence is intertwined with the offense charged. (*People v. Garrison* (1986), 146 Ill. App. 3d 592, 496 N.E.2d 535.) Further, it is also relevant in placing a defendant in proximity to the time and place of the offense. (See *People v. Lee* (1986), 151 Ill. App. 3d 510, 502 N.E.2d 399.) We find that in the present case, the evidence regarding other crimes was admissible to show identity, to place the defendant with a gun in his hand in close proximity and time to the offense charged, to show absence of mistake as well as the circumstances of his arrest.

The arrest took place five blocks from the location of the charged offenses and within one-half hour of the charged offenses. Detective Sanders' testimony described circumstances surrounding Wilson's arrest. The fact that Wilson took a woman hostage and subsequently shot at Sanders indicated Wilson's attempts to resist arrest. Detective Sanders' testimony placed a gun in defendant's hand in the general vicinity and time frame of the armed robberies. Detective Sanders' testimony also explained how the gun that had been in defendant's hand came to lie on the ground, as well as the reason defendant's

sweatshirt was lying on the ground. When Julie arrived at the scene, she identified the gun as the one used in the earlier armed robbery. She also identified defendant's sweatshirt. The identification of these items was made prior to Julie's viewing the suspect. Subsequently, both Julie and Ken identified Wilson as the man who had robbed them at gunpoint earlier that morning. Detective Sanders' testimony also placed the items stolen from Ken and Julie in Wilson's possession, within one-half hour of the charged offenses.

Further, we find the defendant's reliance on *People v. Diaz* misplaced in the present case. We find the *Diaz* case factually distinguishable from the present case. In *Diaz*, the trial court allowed the prosecution to present testimony regarding a subsequent unrelated attempted armed robbery incident at the defendant's armed robbery trial. (*Diaz*, 78 Ill. App. 3d at 279, 397 N.E.2d at 149.) Defendant, Diaz, was being tried for a crime that had occurred the day before the incident for which the prosecution was offering other crimes evidence. The victim of the "other crime" testified that the defendant's co-offender made threats while placing a gun to the victim's stomach (at the time the victim was seven months pregnant). The co-offender told her to "give it up" and if she did not her baby would be "born with a hole in its head." (*Diaz*, 78 Ill. App. 3d at 280, 397 N.E.2d at 149.) The appellate court noted that the principal relevance of the testimony regarding the subsequent offense was that it showed the circumstances of defendant's arrest and that the weapon used was the one stolen during the commission of the crime at issue. The court found that, had the trial court limited the testimony concerning the subsequent armed robbery attempt to that evidence, the prejudice resulting to defendant would not have clearly outweighed its probative value. However, the court found the prejudicial effect of the evidence outweighed the probative value, especially, when all the details of the subsequent crime, particularly the co-offender's threats and the victim's pregnancy, were also permitted to be introduced. *Diaz*, 78 Ill. App. 3d at 280, 397 N.E.2d at 150.

■ In the present case, the incidents occurred one-half hour apart, as opposed to 24 hours apart as in the *Diaz* case. In addition, the testimony in *Diaz* related to threats made by a co-offender, whereas, Detective Sanders testified solely to the actions of the defendant. The information regarding Wilson's arrest not only placed a gun in his hand in close proximity and time to the first incident, the events preceding his arrest indicated a consciousness of guilt.

Finally, we disagree with the defendant's contention that the prejudicial effect of the evidence outweighed its probative value. The prejudicial effect of other crimes evidence is limited when the trial

court instructs the jury that the evidence is to be received for a limited purpose. (*People v. Evans* (1988), 125 Ill. 2d 50, 83, 530 N.E.2d 1360, 1374.) The jury was given the following limiting instruction:

"Evidence has been received that the defendant has been involved in an other [*sic*] than that charged in the indictment.

This evidence has been received solely on the issue of the defendant's arrest and the circumstances surrounding that arrest. This evidence may be considered by you only for the limited purpose for which it was received."

(See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981).) Thus, any prejudicial effect of the other crimes evidence was limited when the jury received the above limiting instruction.

The determination of the admissibility of other crimes evidence rests within the discretion of the trial court, whose decision will not be reversed absent a clear abuse of discretion. (*People v. Holloway* (1991), 225 Ill. App. 3d 47, 51, 587 N.E.2d 1027.) We find Wilson's claim of error regarding the admission of evidence concerning his arrest and activities surrounding his arrest is without merit and find the trial judge was correct in denying defendant's motion *in limine*.

## II

The State petitioned to adjudge defendant a habitual criminal and to impose a sentence of natural life. The petition indicated that in addition to the convictions in the present case, (1) on July 19, 1973, defendant was convicted of armed robbery and sentenced to one to three years in the Illinois Department of Corrections; (2) that on September 27, 1976, the defendant pleaded guilty to the offense of armed robbery and was sentenced to five to eight years in the Illinois Department of Corrections; and (3) on October 9, 1980, the defendant pleaded guilty to the offense of armed robbery and was sentenced to 15 years in the Illinois Department of Corrections.

At the sentencing hearing, Detective McMahon of the Chicago police department testified that on July 9, 1972, he arrested Wilson for the offense of armed robbery for an incident that occurred on July 2, 1972. Said arrest resulted in a conviction. On January 22, 1976, Detective McMahon arrested Wilson for armed robbery for an incident that occurred on January 22, 1976. Said arrest resulted in a conviction. Detective McMahon further testified that on May 26, 1976, he arrested Wilson for an incident that occurred on January 9, 1976. Said case resulted in a conviction.

Officer Suske of the Cicero police department testified that on February 24, 1980, he arrested Wilson for armed robbery. To Officer Suske's knowledge said arrest resulted in a conviction. Detective

Johnson of the Chicago police department testified regarding the investigation of the present case. Detective McMahon and Detective Johnson testified that Wilson was fingerprinted at the time of his arrest and each officer identified fingerprint cards. A latent print examiner for the identification section of the Chicago police department testified that the three fingerprint cards he reviewed, bear the prints of the same individual.

Defense counsel argued that because Wilson was only sentenced to one to three years on the 1972 conviction, it was not an armed robbery for purposes of the sentencing hearing. In ruling, the trial court found that defendant had been convicted of at minimum four previous offenses, that would be classified as Class X felonies. For purposes of sentencing under the Habitual Criminal Act, the trial court utilized the 1976 conviction for the first conviction and the 1980 conviction for the second conviction. The trial court sentenced defendant to two concurrent terms of natural life imprisonment.

■ The Habitual Criminal Act provides that "[e]very person who has been twice convicted in any state or federal court of an offense that contains the same elements as an offense now classified in Illinois as a Class X felony, *** and is thereafter convicted of a Class X felony, *** committed after the 2 prior convictions, shall be adjudged an habitual criminal." (720 ILCS 5/33B—1 (West 1992).) In addition, each of the following requirements must be met: (1) the third offense was committed after the effective date of the Act; (2) the third offense was committed within 20 years of the date that judgment was entered on the first conviction; (3) the third offense was committed after conviction on the second offense; and (4) the second offense was committed after conviction on the first offense. (720 ILCS 5/33B—1(d) (West 1992).) Finally, the statute provides that anyone adjudged a habitual criminal shall be sentenced to life imprisonment, except when the death penalty is imposed. 720 ILCS 5/33B—1(e) (West 1992).

Defendant argues that the Illinois Habitual Criminal Act is unconstitutional. Wilson acknowledges that this claim was not raised at trial but requests this court to address the merits of the argument. Since a constitutional challenge to a statute can be raised at any time (*People v. Bryant* (1989), 128 Ill. 2d 448, 454, 539 N.E.2d 1221), we will address the defendant's arguments. However, the arguments made by defendant have been raised and rejected in numerous prior appeals, and accordingly, we find his arguments without merit.

A

■ Wilson argues the Act is unconstitutional because it requires

the imposition of a natural life sentence without consideration by the court of the seriousness of the offense or the defendant's rehabilitative potential, whereas the Illinois Constitution mandates that those factors be considered in determining a sentence. Wilson further argues that the Act is contrary to the purposes of the Criminal Code of 1961 and the Unified Code of Corrections. See Ill. Rev. Stat. 1991, ch. 38, pars. 1—2(c), 1001—1—2(a).

In *People v. Glover* (1988), 173 Ill. App. 3d 678, 527 N.E.2d 968, this court held that the legislature properly exercised its authority when it determined that in the public interest, any person who committed Class X felonies on three separate occasions must be sentenced to natural life imprisonment. See also *People v. Withers* (1983), 115 Ill. App. 3d 1077, 1090-91, 450 N.E.2d 1323.

B

Wilson argues that the Act violates due process under the Illinois and United States Constitutions, the eighth amendment to the United States Constitution, and the Illinois Constitution because it prohibits the consideration of any mitigating evidence.

■ Defendant's arguments in this regard have previously been rejected by this court and we find no basis for reconsideration of them. "The habitual criminal statute, by requiring a natural life sentence thereby forbidding consideration of the offender's personal characteristics and the seriousness of the offense, does not violate article I, section 11, of the Illinois Constitution, the due process clause of the Illinois and United States Constitutions, and the eighth amendment of the United States Constitution." *People v. Westefer* (1988), 169 Ill. App. 3d 59, 65, 522 N.E.2d 1381; see also *People v. Gray* (1989), 192 Ill. App. 3d 907, 549 N.E.2d 730; *People v. Franzen* (1989), 183 Ill. App. 3d 1051, 540 N.E.2d 548; *People v. Morissette* (1986), 150 Ill. App. 3d 431, 501 N.E.2d 781.

C

Wilson argues that by considering the 1973, 1976, and 1980 convictions, the trial court violated the prohibition against *ex post facto* laws.

The previous version of the Habitual Criminal Act provided that "This Article shall not apply unless (1) the first felony was committed after the effective date of this Act." (Ill. Rev. Stat. 1979, ch. 38, par. 33B—1(c) (effective February 1, 1978).) However, under the amended Act the aforementioned language was excised. Ill. Rev. Stat. 1981, ch. 38, par. 33B—1 (amended by Pub. Act 81—1270, effective July 3, 1980).

Wilson committed the "third" offense in this case on September 6, 1989, and therefore the Act permits any conviction from September 6, 1969, to be considered. The 1973 and 1976 convictions occurred before the effective date of the original Habitual Criminal Act. Wilson argues that the problem lies in the fact that anyone who pleads guilty to a Class X offense is apprised of the punishment, as Supreme Court Rule 402(a) mandates. (See 107 Ill. 2d R. 402(a).) Defendant argues that one consequence that flows from a Class X offense is the potential for habitual criminal status, and that most defendants are warned when accepting a plea to a Class X offense of this possibility. Wilson argues that in 1973 and 1976, there was no Habitual Criminal Act and accordingly no warning given to Wilson when he pleaded guilty. Thus, he claims his plea was not knowingly and intelligently made. We note that the trial court ultimately did not use the 1973 conviction for purposes of finding the defendant a habitual criminal.

Wilson points out that he was not warned that, by pleading guilty to what is now a Class X offense, the crime would be an aggravating factor at sentencing to another Class X offense. He argues this Act aggravated the 1973 and 1976 crimes and changed the punishment for committing them, which is violative of the prohibitions against *ex post facto* laws.

■ However, as the court stated in *People v. Glover* (1988), 173 Ill. App. 3d 678, 527 N.E.2d 968:

"Illinois courts have consistently held that the statute does not place defendant in double jeopardy, and it does not act as an *ex post facto* law, because it prescribes punishment only for the most recent crime, which must have been committed after the statute went into effect. The evidence of prior crimes is used solely to augment the penalty for the last crime." *Glover*, 173 Ill. App. 3d at 686, 527 N.E.2d at 973, citing *People v. McNeil* (1984), 125 Ill. App. 3d 876, 882, 466 N.E.2d 1058; *People v. Washington* (1984), 125 Ill. App. 3d 109, 117, 465 N.E.2d 666; *People v. Mason* (1983), 119 Ill. App. 3d 516, 524, 456 N.E.2d 864.

Each of defendant's objections to the constitutionality of the Habitual Criminal Act has been considered and rejected by Illinois courts. We do not find sufficient grounds for overruling these decisions. Accordingly, we affirm the trial court's imposition of concurrent terms of life imprisonment imposed on defendant.

Judgment affirmed.

GORDON and COUSINS, JJ., concur.